CHARLES B. SHELDON, Appellant, *vs.* JOHN S. and DAVID H. ROCKWELL et al.

APPEAL FROM CIRCUIT COURT, WAUKESHA COUNTY.

Heard July 6.]　　　　　　　　　　　[Decided July 26, 1859.

*Injunction—Mills and Mill-Dams—Limitations—Finding —Flowing Lands.*

It is well settled that a court of equity may, and will, in a proper case, interfere, by injunction, to prevent injury to lands by overflowage, or setting back by a dam.

R. built a dam in 1837, which caused the waters to flow back and cover the lands occupied by S. The dam went off four times, and while the water was so drawn off, S. commenced a suit to restrain the rebuilding of the dam. He had resided all the time on the lands, part of which had been flowed, and set up no excuse for his delay to commence the suit, nor any fraud, misrepresentation, or unfair dealing on the part of the defendants to prevent the suit; held that S. is not entitled to the relief demanded.

The granting or refusal of injunctions rests in the sound discretion of the court; and they are never granted when they are against good conscience, or productive of hardship, oppression, injustice, or public or private mischief. So, where the plaintiff has encouraged the defendant to expend his time and means in the construction of a dam and mills, &c., the court will

Sheldon vs. Rockwell.

not grant an injunction to restrain the rebuilding the dam, which had gone off by a flood.

Where the laws of the state have encouraged the building of mill-dams, during the greater portion of the time during which the dam in question had existed, it would be gross injustice and oppression, when such dam had been destroyed by accident, and the mills of the owner rendered temporarily useless for the courts to interfere and restrain the owner from rebuilding.

The court lends its aid only to the vigilant, active, and faithful; therefore, where a party has been guilty of gross and unparalleled negligence in the prosecution of a suit, he can have no standing in court to obtain the relief he may seek. Unreasonable delay, and mere lapse of time, independently of any statute of limitations, constitutes a defense in a court of equity. Stale demands or actions are not favored.

R. built a dam in 1837, which caused the waters to flow back and cover the lands claimed and occupied by S. The dam was carried away by floods at four different times, and was as often rebuilt by R., up to 1856, during all which time S. resided in the immediate neighborhood, and upon the premises, for the injury to which he complains, and with the exception of a verbal notice of a claim upon his part, when the dam was originally built, that it would be an infringement upon his rights, he remained quiet and passive on each successive occasion of the building of the dam. Held that S. should not now be permitted to object to this last re-construction of the dam. •

An objection on an appeal that no finding in writing was made and filed by the judge, will be over-ruled, unless an exception for that reason was taken in the court below.

This was an action commenced by the plaintiff by a bill in chancery in the circuit court of Waukesha, on the 28th of August, 1856, for an injunction to restrain the defendants from rebuilding a dam across the Oconomowoc river, in Oconomowoc, in that county. The bill states that the plaintiff was the owner, and possessed of two eighty acre tracts of land, through which the creek ran, and on which there was a good water power, which he intended to improve. He began his possession in 1837. There was also on the banks of the creek about 12 acres of meadow land, covered with good grass for hay, and the land was sufficiently dry to gather the hay. The creek could be forded with teams, and the banks were dry. In September, 1837, the defendants, and those through whom they claimed, commenced erecting a dam across the creek below the lands of the plaintiff, and which would flow back on the lands. He requested them to desist from erecting the dam, as it would interfere with his rights in

the enjoyment of his land and water power, which he was preparing to improve. They disregarded his request, and built the dam, and finally raised the water eight feet, flowing back over the plaintiff's meadow lands, spoiling his water power, and destroying his ford, and making it necessary that he should build a bridge to get from one part of his lands to the other. The original parties had transferred the title to the dam and its mills to the defendants. About five weeks before the filing of the bill, the dam went off, and drained the water to its original channel; and the defendants were re-building the dam, and would reflood the lands of the plaintiff to a greater depth than ever before.

The defendants answered the bill, confessing the existence of the creek running through the lands of the plaintiff, that the dam was built, and that it had gone off as stated in the bill, and that the water had been drawn down, and that the defendants immediately set to work to rebuild it. The answer then denied that there was a good water power on the lands of the plaintiff, but that the banks had always been low and wet, not much elevated above the level of the stream; that they did not interfere with the plaintiff's water power; that there was not, and never had been, a ford across the creek, and that the plaintiff had not been compelled to build a bridge to cross the creek; that the raising of the water by the dam will not produce any tangible or permanent injury to said land. The answer further sets up in justification, that the plaintiff had acquiesced in the flowing of the land since 1837, or for 19 years, and that it would be a great loss to the defendants if they are deprived of the use of the water power created by the dam; and then submit that the plaintiff had a full remedy at law, and claim as by demurrer. The replication was filed Oct. 29, 1857, and the case came on to trial in June, 1858, when the plaintiff examined a large number of witnesses, the evidence of which he has saved by a bill of exceptions.

*Ira D. Loundsbury*, a witness produced and sworn on the part of the plaintiff, testifies and says: I am forty-seven years of age and upwards. I am acquainted with the parties in this action, and have known them ever since the 1st of June, 1837. I have known Charles B. Sheldon ever since then up to this time. The first time I saw him was at Delafield, a place then called Hayopolis. I then had some conversation with him about his mill site on the Oconomowoc river; and I concluded to go into company with him. We went on to

the claim in the fore part of June, in the year 1837. Mr. Sheldon claimed a half section, and the premises he now occupies are a part of that claim. The claim was the east half of section thirty-three in town eight, range seventeen east, being in the town of Oconomowoc, in Waukesha county. The Oconomowoc river runs through the claim, and he and I built a cabin on the place. There was no claim then where the village of Oconomowoc now stands. It was then vacant and unoccupied by any one, as I then understood. From that time to the present Mr. Sheldon has occupied a part of that same land. The water power on that land was then considered the best water power on that stream, and in this section of the country. I considered it as such. We calculated to build the dam on the west part of that land; but I think there was equally as good a place on the eastern part of the land, where Mr. Sheldon's bridge now is. I considered the water power on that land worth then a thousand dollars. It was then thought there might be a water power where Rockwell's dam now is, but it was not considered then worth improving; that was the general opinion then. Rockwell's water power was then unoccupied and unclaimed. The land was not then in market. The stream was then called by some Oconomowoc creek, and by some Oconomowoc river. It was then Mr. Sheldon's intention to improve the water power on his claim, and put up a mill. He talked of doing so. After that, in August or September of the same year, John S. Rockwell, Lester R. Rockwell, Allen W. Hatch, and a man named Brewer, commenced building a dam, where the dam of the defendants now is. As soon as I learned they had commenced building the dam, I went to Milwaukee for advice how to proceed, and took counsel of John Hustis in relation to it. He told me to tell them that we had a mill power there, and to forbid them overflowing it. Curtis Brown, Mr. Sheldon, myself, and some others, came down, Mr. Brewer was then on the place, the head manager. I told him I had taken counsel, and had come to forbid him to build the dam. I told him that Sheldon and I had a mill power, and forbid them to overflow it, and told him then, when we got a duplicate for the land, we should take measures to have him remove the dam, and prevent him from flowing our land and spoiling our mill site. At that time they had got a cabin up, and Brewer was living in it; but they had not commenced building their dam. There was a little fall of water between the two lakes, but not much. There was quite a current for

three or four rods. Along in the fore part of June, in 1837, after we had got the shanty built, when Sheldon was getting breakfast, I was in the habit of going out with my rifle, to shoot ducks, and crossed the stream by wading, with high boots, near where the bridge now is (Sheldon's bridge). The banks were dry and hard, they were bold banks, and were not miry. The bed of the stream was gravelly and hard. I waded frequently where Sheldon's bridge now is, and a little above there, across the stream. The claim was in Sheldon's name, and was made by him, and I had a contract with him for an undivided interest of the claim. The east half of the land is the land now occupied by Mr. Sheldon, and has been occupied by him ever since the first of June, in the year 1837. In the summer of 1837 Mr. Sheldon and I cut grass on the marsh, just above Mr. Sheldon's bridge, and made a stack of hay there on the marsh. It was then so dry that we could drive a team over it. I think we drove a team over it to stack that hay. I sold out my interest in the claim to Mr. Morris, in October or November of that same year, and after that, in the same year, I went to work for Rockwell, Hatch, & Brewer, on the defendants' dam. We did not finish the dam that winter, but I think we did enough that winter to flow the water back over Mr. Sheldon's water power. Rockwell and Hatch paid me for my work on the dam, out of their store in Milwaukee. They quit work on the dam the last of December or the first of January. I think I was back again to defendants' dam the next season. The first time I saw Sheldon's land, after that, the land above Sheldon's bridge, the marsh, where we had cut hay in 1837, was all overflowed. It was so overflowed as to spoil his water power, and so as to prevent his cutting any grass on the marsh there. I do not recollect of seeing the water off that marsh until two years since ; at which time defendants' dam went off. I was at Sheldon's place and found the bottom we had built for the hay stack in 1837. There was grass growing there. I went in and found some old logs, where I suppose we built the stack in 1837. At this time two years ago, Rockwell's dam had partly gone away. The flowing of the water back made the marsh softer and more spongy than it was before, and made the banks of the stream softer. In 1837, and before the defendants's dam was built, a person could cross the stream with teams, easily, at and above Sheldon's bridge, unless it was at the time of a freshet. In relation to my acquaint-

ance with the parties in this action; I mean, I was acquainted with Charles B. Sheldon and John S. Rockwell, in 1837.

*George W. Pugh.* I am acquainted with the parties to this action and reside in the town of Oconomowoc. I was at Oconomowoc, where the village of Oconomowoc now stands, first in July 1837. I have been acquainted with Mr. Charles B. Sheldon for twenty-one years, this present June. I was acquainted with the witness, Ira D. Loundsbury, in June, twenty-one years ago. I then lived in Summit, about three miles from Oconomowoc village. Mr. Sheldon and Mr. Loundsbury were then occupying a claim on the east half of section thirty-three, in the town of Oconomowoc. They had a shanty built there and lived in it. At that time I was up and down the Oconomowoc creek several times, and across the land now occupied by Mr. Sheldon. The stream was rapid, and had a gravelly bottom all along above where Sheldon's bridge now is. Hatch, Rockwell & Co. commenced their dam on the Oconomowoc stream, in August, 1837, where the present dam of the defendants is located, or six or eight rods below where the present dam is located. Lester Rockwell was present part of the time, and Mr. Brewer all the time, and took charge of building the dam. I worked for them on the dam. They got the dam built so as to run the saw a little the last of December, in that same year. I am not positive as to the exact time of starting the mill. I am not certain that they sawed any before I went away. The place where Hatch, Rockwell & Co., put up their dam was near the mouth of Oconomowoc creek, where it empties into La Belle lake, on the west half of section thirty-three, in the town of Oconomowoc, and about half a mile or little more, in a straight line northwesterly from Sheldon's water power, and below Sheldon's water power on the same stream. Defendants' dam went off about the first of July, in the year 1830. They immediately repaired it. I worked on it all the time they were rebuilding it. The dam broke again in July, several years afterwards. I cannot tell what year. The dam again went away, two years ago this summer, so as to draw the water down, but not down to the original level of the stream. These defendants rebuilt the dam again two years ago. John S. Rockwell, David Henry Rockwell, and James Luck, are the defendants I mean. I remember of helping Mr. Sheldon draw a load of hay from a stack on his marsh, near the Oconomowoc stream, above his bridge, and near the east line of the place now occupied by him, in the fall o

1837. Mr. Sheldon has lived upon that land ever since the year 1837, and is living there now.

*Orson Reed.* I am acquainted with the parties to this suit, and reside in Summit, and have resided there twenty-one years this month. I was up and down Oconomowoc river several times, in the summer of 1837. I became acquainted with Mr. Sheldon that same summer. Mr. Sheldon had a tract of land on section thirty-three, in the town of Oconomowoc, in the summer of 1837, that he controlled. He then, and from that time until now, has resided on that same tract of land, and controlled it. There was at that time no difficulty in crossing the Oconomowoc river with teams, any where on Mr. Sheldon's land, to the best of my recollection. The marsh lands along the river, on Mr. Sheldon's land were not wet then. I staid with Mr. Sheldon, and worked on his place a week or more, in the, fall of 1837. I was at work then for Mr. Sheldon and Mr. Morris, to secure their claim, so that they would not lose their water power. Mr. Sheldon then talked of putting up a mill there. It is my recollection now, that Mr. Sheldon's water power was then called the best water power in the vicinity. I recollect when the dam in the village of Oconomowoc was put up. I think they were at work at it in the fall of 1837 or 1838. I do not recollect which now. The land that Sheldon claimed, and occupied in the summer of 1837, is the claim that he now resides on.

*Timothy Morris.* I am thirty-seven years of age, and upwards. I resided in the town of Oconomowoc about ten years. I commenced residing in the town in July, of the year 1837, on section twenty-eight, about eighty rods from where Sheldon now lives. When we first moved in, we lived in a shanty, on Mr. Sheldon's premises, which he then and now occupies. Mr. Sheldon then had a water power on his premises, which was generally supposed to be the best water power there was in this section of the country. I think the water power of Sheldon's was then considered worth one thousand dollars. There was a general talk of that kind. When we moved in, we forded the Oconomowoc river, on the premises, a short distance below where the bridge is, with two yoke of oxen and a load of twenty-five hundred pounds weight; and the wheels did not sink in up to the hubs. We afterwards forded the stream on Sheldon's land, where the bridge is now. The fording was then very good. I think a team would draw a load of half a ton through it, most any

time. The water there was about twenty inches deep. I know we went through there as much as twenty times. The marsh along there was what I call a dry marsh. I crossed it a great many times, while hunting. I think the banks lay some eighteen inches above the water, along through Sheldon's land. I think the dam below Sheldon's was built in the fall of 1837. I worked on it. It is my opinion that the dam caused the water to set back and overflow the marsh on Sheldon's land so as to spoil it. I know of my own knowledge that it caused the water to flow back and overflow Sheldon's water power and marsh, so as to completely spoil the water power. When the dam of defendants went off, two years ago, it drew the water nearly off; but not down to its original level. After defendants re-built their dam, two years ago, I examined the stream above, and found that the water flowed back on Sheldon's land so as to overflow his marsh, and the banks of the stream, and drown out his water power. I made the examination two years ago. I think the dam of the defendants was built six feet high in the first place. It went off in 1838, when they re-built it. I think they built it a foot higher. It went off again, I think, in 1841 or 1842. When they built the dam again, I understood the defendants to say that they were to build it seven and a half feet high. The dam has gone off four times previous to this summer. Two years ago this summer was the fourth time. When they built the dam, two years ago, I do not know of my own knowledge the exact height they built it. The dam of the defendants raised the water, at Sheldon's bridge, twenty-six or twenty-eight inches above the natural level of the stream. I kept a measure to see how much they raised the water when they put up the dam two years ago. I recollect of Sheldon's cutting hay there and putting up a stack, in the year 1837. That marsh would yield a ton and a half of hay to the acre. It was pretty heavy grass, rather coarse and pretty tall. That was the first year the marsh was mowed. It improves the grass on a marsh to mow it yearly. Hay was worth then about four dollars a ton on the marsh. The pasturage on the marsh, after the grass was cut, was worth as much a year as cutting the grass and putting up the hay. The use of the marsh, as it now is, is worth nothing on account of the water flowing back on it.

The witness here examined the map annexed, and said : I think this map is correct, and correctly represents the land occupied by Mr. Sheldon and the Oconomowoc river running

through it, the marsh on his land and the bridge on his land over the stream are the same land I have been testifying concerning. In the summer of 1837 a road could have been made across the marsh, in the middle of the farm now occupied by Sheldon, at a small expense, by putting gravel on, with brush under. The stream then was not over two rods wide, and then it would have cost but little to have built a bridge; now it would be necessary to build a bridge all the way across the marsh, about fifteen rods. There is no other place on Sheldon's land where a bridge could be built across Oconomowoc river now, without very great expense, except where it is built. It is much more trouble and inconvenience to Mr. Sheldon to have to cross the stream where the bridge now is, than it would be to cross the stream at about the middle of his farm. It would probably make several hundred miles travel difference each year, in the way his farm is situated. The stream runs a little north of the centre of his improved farm. As the stream was in 1837, before the erection of defendants' dam, it was a good watering place for cattle to go down to the stream any where on Sheldon's land, and the stream was open most of the winter of 1837 and 1838. Since then the marsh freezes over during the winter like a lake, and there is no convenience for watering cattle there during the time it is frozen over.

*Curtis B. Brown.* I am fifty-two years old and upwards; I am somewhat acquainted with the parties in this action; I have been acquainted with John S. Rockwell and Mr. Sheldon, since the summer of 1837; I came to the town of Summit in June of the year 1837; I have resided in the town of Oconomowoc now about fourteen years. The witness here examined the map and said: I was present when the survey was made, from which this map was made. William R. Williams, of Waukesha, made the survey and map. It correctly represents the lands occupied by Mr. Sheldon in 1837, and which has, ever since then, and are now, occupied by him. In the summer or fall of 1837 I was authorized by a man by the name of Lampman, a mill-wright, to offer Mr. Sheldon six hundred dollars for his water power on the Oconomowoc river, on the premises he then occupied and now occupies; I went and talked with Mr. Sheldon about the purchase of the water power, and made him the offer of six hundred dollars for it. He refused the offer. At that time Mr. Sheldon's water power was considered by those who looked at it, as a better water power than the one below it on the same stream.

Sheldon vs. Rockwell.

I kept a house of entertainment at the time, and heard people that stopped with me talk about it. In the spring or summer of 1838 I forded several times the stream on Sheldon's premises. The water was then, in the bed of the stream, some twenty inches or two feet deep. The place where I forded the stream, was thirty or forty rods above where Sheldon's bridge now is. This bridge is over the stream on the west line of the land now occupied by Mr. Sheldon. The marsh along the stream was then an ordinary hay marsh. I went on it with oxen and a wagon, and drew hay off. The banks were hard, and were about eighteen inches above the level of the water in the stream. The current in the stream above Sheldon's bridge, as marked on the map, was quite rapid for some thirty rods above the bridge. In the fall of 1837, I went with Mr. Loundsbury, Mr. Sheldon, and several others, down to where the defendants' dam is now located, and there Mr. Loundsbury, in our presence, forbade the defendants to build their dam. Mr. Sheldon was present. Mr. Loundsbury did the talking, and claimed to have an interest with Mr. Sheldon. Mr. Philo Brewer was the man the notice was served on. He was one of the company who were then building the dam, and had the principal charge in building it. Loundsbury notified Brewer that he and Sheldon had a water power above and intended to improve it, and forbid defendants from building their dam below. The time I refer to, when I forded the stream, was previous to Sheldon's land being flowed by defendants' dam. I noticed after that, the water set back on Sheldon's land so that there was no ripples in the current. I noticed it several times after the water set back so as to overflow the marsh. It overflowed it so that it was worthless. I think the setting of the water back on Mr. Sheldon's land would completely destroy his water power there. I was at Sheldon's place after the water was drawn off by the breaking of defendants' dam two years ago. The water was drawn off the marsh so that it was nearly dry. It was boggy. The water was then down in the stream, about eighteen inches below the top of the marsh. I was there again in the fall of 1857, when this map was surveyed. The defendants' dam had been rebuilt then. The water was then flowed back over the marsh again so as to cover up the marsh and drown out the water power. The water overflowed the marsh to the high land on each side of the stream. I think there is a good place to build a dam across the stream near where Sheldon's bridge now is. He has to bridge about seven rods

there; I mean bridging and filling in for that distance. There are some eight or nine acres of marsh, I suppose, on Sheldon's land overflowed.

*Prescott W. Goodell.* I am acquainted with the parties to this suit. I reside in Oconomowoc. My land joins Mr. Sheldon's lands on the east. My lands are marked on the map " Goodell's." The Oconomowoc river runs through my land before it comes to Sheldon's. I have examined this map; it correctly describes Mr. Sheldon's lands, and his marsh, and the river running through, as I understand it. I reside about thirty rods easterly of Sheldon's east line, on the southerly side, over the Oconomowoc river. I have been acquainted with Mr. Sheldon and his lands there since 1839. When I came there Sheldon's lands were overflowed. I did not see the lands of the plaintiff previous to defendants' overflowing it. When I first became acquainted with Mr. Sheldon's lands his marsh was overflowed, so that cattle could not go over it and feed. I remember of defendants' dam going away two years ago this summer, by which the water was drawn off. It drew the water off, so that it was in a narrow channel. I measured the water once, while the water was down, by Sheldon's bridge, and found it had been drawn twenty-eight inches. The water was drawn down so as to make my marsh, just above Sheldon's, perfectly dry. After defendants rebuilt their dam my marsh was wet. Previous to defendants' dam going off, two years ago, my marsh was a wet marsh, so that we could not go on it with horses; but the season the water was down my marsh was firm and dry, so that we raked the hay on it with horses, and stacked it with horses without difficulty. The horses did not break through at all. After defendants rebuilt their dam it flowed the water back, so that we could not go on with horses. I could only cut a part of the grass on it. We have never been on with horses since then in the summer.

When defendants rebuilt their dam, two years ago, it raised the water on Sheldon's land over two feet. I can not say how much over two feet. Hay on the marsh at my place, and in that vicinity, has been worth, on an average, from four to five dollars a ton. I know that defendants raised their dam, when they rebuilt two years ago, higher than it had been before. It is my impression that the dam was then built eight feet high. The banks of the stream, near above Sheldon's bridge, are high and good—higher than any where along the stream—and in my opinion, a great deal the best place

on the stream for a mill-dam; and it would have been a great deal better site for Oconomowoc village than where it now is. Defendants' dam sets the water back, and over-flows, so as to completely destroy Sheldon's water power there, and make valueless his marsh. I am thirty-five years of age and past.

*John Seely.*—I am acquainted with the parties to this suit, and have been more or less for four or five years. I am ac-quainted with the premises now occupied by Charles B. Shel-don, and have worked for him. I was at Mr. Sheldon's place and worked for him when defendants' dam went off in July, two years ago this summer. Previous to defendants' dam going off then, there was water on the marsh, so much that it could not be mowed, and we could not go on it with cattle or horses. When the dam went off it drew the water off so that we went on it on the bogs. When they raised the dam again the water flowed back again over the marsh, so that we could not go on it.

The plaintiff then read his patents from the Territory of Wisconsin, dated the 5th of August, 1839, and rested his case. The defendants offered no evidence; and the case was so sub-mitted to the judge of the court, who decided verbally, that the bill be dismissed, with costs of suit. Upon which, judg-ment was entered by the clerk.

From that judgment the plaintiff appealed.

*E. Hurlbut and J. G. Knapp*, for Appellants.

The judgment of the circuit court cannot be sustained:

*First.*—There is no finding of the facts or the law by the judge who tried this cause, and for this reason the judgment must be set aside.

This trial was had under the code, according to § § 177 and 356; and the court has not stated in writing the facts found by him, and the conclusions of law thereon, as required by § 177. This is absolutely necessary, and if be not so found by the judge the judgment must be reversed. This same provi-sion was adopted by the State of Missouri, in 1849, Art. XV., § 2, and upon it the supreme court has decided in *Bates vs. Bowen*, 17 Mo. Rep., 553, that "The decision which is to be made in writing, is to contain a statement of the facts, and then the conclusions of law upon them. As the conclusion of law which is thus to be pronounced, is a conclusion upon all the facts material to the right of action and defense. Such

Sheldon vs. Rockwell.

material facts should all be stated in the decision itself, and not by reference to depositions or other papers. The decision is evidently a substitute for a special verdict, or the statement of facts in the old form of rendering a decree in chancery, and is intended to show the whole case upon which the judgment is rendered." * * * " When the decision is made, stating the facts and the conclusion of law thereon, the judgment which is entered according to such decision, will be erroneous if the facts found do not warrant the conclusions of law expressed in the decision." * * * "In the present case we have a trial by the court, and neither a special finding of the facts nor a general verdict for either party. There is a kind of decree entered, in which it is ordered and adjudged that the plaintiff's mortgage is null and void, as to a part of the property mentioned in it; and it is further adjudged, that another part is subject to the mortgage. The judgment will, therefore, be reversed, because there is no decision made in conformity to the code." This case was affirmed and followed in *Farrar vs. Lyon*, 19 Mo., 122; *Pearce vs. Barns*, 22 id. 577; *Pearce vs. Roberts*, 22 id. 583.

The case of *Sayre et al. vs. Langton*, 7 Wis., 214, decided at the last term of this court does not in any manner conflict with the positions taken by the court in the decisions cited from Missouri, because in that case there is a finding of the facts by the clerk to whom the matter had been referred.

As neither the facts nor the law are found by the judge in the case at bar, we may well say that we are at a loss to imagine on what ground this judgment is to be sustained. And especially when we are told by Angel on Water Courses, § 444, that it is well established that courts of equity have concurrent jurisdiction with courts of law in cases of private nuisance; and the interference by injunction is founded upon the ground of restraining irreparable mischief, or of suppressing oppressive and interminable litigation, or of preventing a multiplicity of suits.

And again, § 445, he says, cases of the obstruction of water courses, the diversion of streams from mills, back-flowage, &c., have long been regarded in England as of a nature calling for the remedial interposition of a court of equity.

These statements are fully sustained by the cases cited, and to which, with others, we shall ask to refer if need be. Willards Equity, 392.

The rule given in Story's Eq. Jur., § 927, is, that cases

calling for the remedial interposition of courts of equity, are the obstruction of water courses, the diversion of streams from mills, the back-flowage on mills, (and he might have added on adjacent lands.)   And the pulling down the banks of rivers, and thereby exposing adjacent lands to inundation or adjacent mills to destruction.

And again, in the case of *Scudder vs. Trenton Delaware Fall Co.*, Saxton Ch. R. (N. J.), 694.   The court has laid down this broad rule, and said, " The power of courts of equity to interpose by injunction in cases of waste, private nuisance and great and irreparable injury to the inheritance, is as well established as any that the court now exercises. It does not rest on modern or questionable decisions, but is ancient, uniform, and not now to be shaken.   The late cases have so construed this power as to embrace trespasses of a continuous or extraordinary character." *Morris vs. Remington*, Parson's Sel. Cas. 394 ; Angel on Water Courses, §§ 445, 456; *Luaekenbush vs. Van Riker*, 2d Green, N. J., Rep., 350; *Van Bergen vs. Van Bergen*, 2 J. C. R., 272; *Lumborn vs. Covington Co.*, 2 Md. Ch. Dec., 409 ; *Georgetown vs. Alexandria Canal Co.*, 12 Peter's, 91 ; *White vs. Forbes*, 2 Walker's Ch. R., 112.

Again, the bill charges that the defendants threatened to raise the dam to eight feet, that is higher than it ever was before ; and though the answer does not deny this charge, the plaintiff has proved the averment.   For this, at least, he ought to have relief upon this bill.

*D. W. Small & J. Downer*, for respondents, insisted upon the staleness of the claim set up.


*By the Court*, DIXON, C. J.   There is no doubt of the power of a court of equity to interfere by injunction, to prohibit injuries occasioned by the back-flowage of water, in cases like the present.

But in this proceeding there is one feature which we consider conclusive upon the rights of the parties.   It is the length of time which the plaintiff permitted to pass after the erection of the dam in question, and before the commencement of his suit to restrain its construction or continuance.

Nineteen years elapsed between the building of the dam and the institution of this action. The dam was begun in August, 1837; this suit in August, 1856. In less than twelve months more his remedy at law, by action on the case, would have been barred. In the meantime, the dam was four times destroyed by floods, and as often rebuilt by the defendants. During all the time, the plaintiff resided in the immediate neighborhood, and upon the premises for the injury to which he now complains. With the exception of a verbal notice to the defendants at the time the dam was originally built; that its erection would be an infringement of his rights; he remained during all the time a calm and constant observer of every step taken, and every movement made by the defendants, without one word of complaint or warning. He commenced no suit; consulted no attorney. No fraud, misrepresentation, or unfair dealing on the part of the defendants is alleged. No accident, mistake, or excuse for the delay on his part is set up. After nineteen years of profound sleep, he seems suddenly to have awakened to a sense of his position, and finding the dam, for a fifth time swept away by high water, and the defendants engaged in replacing it, the same as before, he asks of a court of equity that they be restrained. Could a more preposterous proposition be urged. A statement of these facts constitutes the strongest refutation of his claim for relief.

The granting or refusal of injunctions rests in the sound discretion of the court. They are never granted when they are against good consience, or productive of hardship, oppression, injustice, or public or private mischief. The plaintiff, by his silence and acquiescence, has invited and encouraged the defendants to expend their time and means in the construction and repairing of the dam, and the mills and machinery used in connection with it. In them they have a large pecuniary interest; and though they may have erected

them for purposes of private speculation, they are, nevertheless entitled to the consideration of the court. The public have a large interest in the improvements created by their capital and enterprise.

During the greater portion of the time since the erection of the dam in question; the building and maintaining of dams and mills have been so much regarded matters of public concern, that they have been, and now are, fostered and protected by statutory laws. For a court now to interfere and say to the defendants, that they shall not rebuild their dam, because, by an accident against which it was impossible for them to guard, it has been destroyed, and their mills and machinery thereby rendered temporarily useless, would be an act of gross oppression and injustice.

The court lends its aid only to the vigilant, active, and faithful. This tardy application must be regarded as made in bad faith. After his gross and unparalleled negligence, the plaintiff can have no standing in court for the purpose of asking the relief here sought. Unreasonable delay, and mere lapse of time, independently of any statute of limitations, constitute a defense in a court of equity. This doctrine is very ancient, and established by a great number of decisions.

In the leading case of *Smith vs. Clay*, Ambler 645, Lord Camden said: "A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced; and, therefore, from the beginning of the jurisdiction, there was always a limitation to suits in this court."

In *McKnight vs. Taylor*, 1 Howard, U. S. Rep., 161, a bill

filed to adjust matters of account, *which were not barred by the statute of limitations,* was dismissed for want of reasonable diligence. Taney, C. J., adopts the language of Lord Camden, and adds: " It is not merely on presumption of payment, or in analogy to the statute of limitations, that a court of chancery refuses to lend its aid to stale demands."

In *Haight vs. The Proprietors of the Morris Aqueduct,* 4 Wash. C. C. R., 601, the defendants having had the adverse possession for twenty years, of certain water, which had previously flowed into the plaintiff's mill pond, which they had used during that period by means of an aqueduct for supplying water to the town of Morristown, suffered it to go into disuse, in consequence of a decay of the logs of the aqueduct, for three years, during which the water again flowed into the plaintiff's pond. Upon the defendants commencing the reconstruction of the aqueduct, the plaintiffs applied for an injunction, which was refused, on the ground that twenty years' possession vested a complete title to the water in the defendants. In passing upon the case, Washington, J., says: " The next objection to the interference of this court, which I consider to be insuperable, is the acquiescence of those under whom the plaintiffs claim, in the construction of this aqueduct originally; and in their subsequent use and enjoyment of the water by which it was supplied; which circumstance, though unaccompanied by long possession, would be sufficient to close the doors of a court of equity to this application. In such a case the court will not only refuse to interfere in favor of the party who has thus acquiesced, or been guilty of inexcusable negligence; but will even grant injunctions to restrain actions brought at law for the nusiance." Although the latter proposition may not be true, the former is undoubtedly the law of such cases.

In the case of the *Birmingham Canal Co. vs. Lloyd,* 18 Vesey, 515, the plaintiffs having permitted the defendants to

proceed for nearly two years, and to expend a large sum of money in the erection of their machinery, Lord Eldon refused an injunction, for the reason that the plaintiffs had not commenced their opposition when they could have done so with justice.

If in England two years acquiescence defeats a proceeding like the present, how much less delay ought to suffice for that purpose in a newly settled country like our own, where by the rapidity of our growth and enterprise, a few months oftentimes determines the destinies of our cities, villages, and places of business? The diligence required by the law ought to be measured by the mischief which would ensue from a want of it.

The same principles will be found established in the following English and American cases: *Bond vs. Hopkins,* 1 Sch. & Lef., 413, 428; *Hovenden vs. Lord Armesley,* 2 id., 607, 630, to 640; *Stackhouse vs. Bornston,* 10 Ves. 466; *Beckford vs. Wade,* 17 Ves., 466, 467; *Chalmondeley vs. Clinton,* 2 Jac. & Walk., 1, 138 *to* 152; *Postlock vs. Gordon,* 1 Hare R., 594; *Vigors vs. Pike,* 8 Clarke & Fin., 650; *Decouche vs. Savetier,* 3 John. C. R., 190; *Kane vs. Bloodgood,* 7 id., 93, *Dexter vs. Arnold,* 3 Sum., 152; *Piatt vs. Vattier,* 9 Peters, 405, 416, 417; *Sherwood vs. Sutton,* 5 Mason R., 143, 145, 146; *Bowman vs. Wathen,* 1 How., U. S. R., 189; *Gould vs. Gould,* 3 Story R., 516; and *Weller vs. Smeaton,* 1 Cox, Ch. R., 102.

The objection that no finding in writing was made and filed by the judge, is overruled for the reason that no exception was taken.

The judgment of the circuit court is affirmed, with costs.