Thomas v. Woodman.

## W. A. THOMAS, *et al.*, v. W. C. WOODMAN.

NUISANCE, *Abatement of; Laches; Estoppel.* In 1874, W. & S. constructed a flouring mill on Chisholm creek, in Sedgwick county, to be run by water. For the more efficient operation of the mill, they diverted one-half of the water of the Little Arkansas river into said creek, by means of a dam, about five feet high, across the Little Arkansas, and a trench or race-course from said river to the creek. These improvements cost about $30,000. In the summer of 1875, the mill property was sold to T. for $22,000, and he at once sold certain interests in the mill to others, and said owners then made additional improvements to the value of $7,000. In 1876, E. & L. became the sole owners of all the mill property. The dam has been washed out three times, and rebuilt each time. Two of the washouts occurred after the fall of 1876. The effect of this diversion of water on the river below the dam causes the accumulation of sand bars at the mouth of the river, by which the water becomes sluggish and grass grows in the river, which at times decays, and is offensive to the smell, and also renders the water unfit for bathing purposes. One W. has had, since 1873, a residence and improvements on several acres of valuable land about five miles below said dam, upon the east bank of the Little Arkansas, one mile from its confluence with the Arkansas river, and within the limits of Wichita. W. discovered in the summer of 1876 that the odor arising from the grass which accumulated and decayed in the river near his premises was exceedingly offensive to him and his family, and injurious to his residence as a desirable home. He deferred making any active opposition to the diversion of water till March 14, 1878, when he commenced a suit to remove the dam, to fill up the trench or race-course, and to stop the diversion of water from the Little Arkansas into Chisholm creek. *Held,* That having delayed so long in his legal opposition to the diversion of the water from the Little Arkansas, and the dam having been twice rebuilt, after he had become fully acquainted with the consequences to him and his property of such diversion, he has deprived himself of the right to the interference of a court of equity, and his claim for equitable relief must be denied.

*Error from Sedgwick District Court.*

ON March 14, 1878, *W. C. Woodman* filed in the district court of Sedgwick county his petition against *W. A. Thomas, N. W. Ellis* and others, praying that the defendants be compelled to abate and remove a certain dam across the Little Arkansas river, and to fill up a race-course diverting the water above the said dam into a stream called Chisholm creek; and also, that said defendants be enjoined from rebuilding and maintaining said dam, and from turning water from the Little Arkansas into Chisholm creek. The answer of the defendants set up matters claiming to create an equitable estoppel to any interference on the part of a court of equity in favor of the plaintiff; and also certain proceedings of condemnation, whereby it was further alleged that the defendant had the right to maintain said dam and cause a diversion of the water into Chisholm creek, for the use of operating a flouring mill. The case was tried before the court, without the intervention of a jury, at the December Term, 1878. The findings of fact were as follows:

1. The plaintiff owns a small body of land, upon which he has placed valuable improvements, and which he occupies as a home for himself and family. He purchased the place in the year 1873, and has ever since that time continued to reside upon it, and has been at considerable pains and expense to make it a desirable home. It consists of several acres of valuable land, upon the east bank of the Little Arkansas river, about one mile from its confluence with the Arkansas river, and is within the city limits of Wichita, a city of the second class, containing a population of several thousand persons.

2. In the spring of 1874, Wheeler & Shutz commenced the erection of a flouring mill on Chisholm creek, a small stream about one-half mile east of Wichita. Chisholm creek empties into the Arkansas river several miles below the mouth of the Little Arkansas. Wheeler & Shutz laid the foundation of the mill and dug a trench from the Little Arkansas to Chisholm creek, in the spring and summer of 1874, and also commenced the erection of a dam across the Little Arkansas at and below the point where the trench touched the

east bank of the Little Arkansas, the purpose of which dam and trench was to divert the water of the Little Arkansas river into Chisholm creek, to be used for a water-power with which to run the mill. The dam was located several miles (about five) above the plaintiff's premises.

3. In the mean time, Wheeler & Shutz commenced proceedings under the mill-dam act, to obtain the right to erect said dam, and to divert the water of the Little Arkansas into Chisholm creek.

4. The petition for the appointment of the commissioners was presented to the judge of the 13th judicial district of the the state of Kansas, and of the district court of the county in which the dam and mill were located, on the 23d day of May, 1874.

5. The petition set forth, that Wheeler & Shutz were the owners of the land upon which the proposed mill was to be erected; that the proposed dam across the Little Arkansas river would not exceed two feet in height. The petition also gave the names of the persons owning land to be affected by the erection of the dam, including the name of the plaintiff, and also designated the point at which the dam would be built, and that the purpose was to divert a portion of the waters of the Little Arkansas. On the day the petition was presented, commissioners were appointed by said judge, in accordance with chapter 66 of the General Statutes of the state of Kansas. The commissioners qualified and proceeded to discharge their duties, and the plaintiff was duly notified of the time and place of their meeting to assess damages in the premises, and on the 4th of September following, the commissioners completed their report, and on the 9th of the same month their report was duly filed with the district clerk of the proper county.

6. No appeal was taken from the assessment of damages in their proceedings. The dam was erected and trench dug, and the erection of the mill building commenced, before the filing of said report.

7. The diagram hereto attached shows the location of the dam and trench, and mill and Woodman's premises, the Little Arkansas and Big Arkansas and Chisholm creek, and the city of Wichita.

8. On June 13, 1875, Wheeler & Shutz sold a one-third interest in the mill property to Philip Sipe. On February 10, 1876, Wheeler, Shutz & Sipe sold the mill property to the defendant, W. A. Thomas, and on the same day Thomas sold

a one-third interest to J. C. Fraker, and a like interest to E. L. Wheeler. The consideration of the sale to Thomas was the sum of $22,000. After Thomas, Wheeler & Fraker became the owners of the property, they expended $7,000 in improvements upon it, and operated the mill until the 18th day of September, 1876, when Fraker sold to J. R. Mead, in trust for the creditors of the first national bank of Wichita, and Mead conveyed to H. B. Cullum, receiver of the bank, and Cullum to the defendant, Ellis. The interests of Thomas and Wheeler were sold under judicial sale, and Ellis purchased and now owns two-thirds of the property, and Lewis purchased the other third. The building of the mill, and appurtenances, cost about $30,000.

9. Wheeler & Shutz erected a dam across the Little Arkansas river to the height of five and one-half feet, and it has been kept and maintained to that height since it was first erected.

10. It has been washed out three times, and again built, and is now to the height of four and one-sixth feet.

13. The dam, as constructed and maintained, diverts at least half of the water of the Little Arkansas river from the natural channel into Chisholm creek.

14. The effect of this diversion upon the stream below the dam is to cause the accumulation of sand bars at the mouth of the river, by which the water becomes sluggish. Without the dam there is at all times a current of clear, pure water. The current being impeded, as above described, caused a kind of grass to grow from the bottom to the top of the stream, which, at times, becomes very thick and rank, and as it decays, becomes offensive to the smell, and makes the water nasty and unfit to bathe in. Adjoining and near the premises of the plaintiff, the Little Arkansas river, in its natural state, is wide and deep, making a large body of water, which is particularly subject to the accumulation and growth of this grass, but when the waters up the river are allowed to run in their natural channel the grass does not grow in this pool, and it was never known to grow there before the erection of the dam. The odor arising from the grass at times becomes exceedingly offensive to the plaintiff and his family, and to any one passing near the bank of the river.

15. The building of this dam was a matter of general notoriety among the people of the city of Wichita and vicinity, and the defendant knew from general rumor, that it was to be built, and the purposes for which it would be used; but

did not know, and had no reason to believe, that it would cause the grass to grow, and make the water and the atmosphere offensive, as it has.

16. Before Thomas purchased, he had a casual conversation with the plaintiff, in which he told the plaintiff that he intended to purchase the mill property, and put it in good running order. The plaintiff made no special objection at the time or afterward. At this time Woodman knew the height of the dam, and its effect upon the stream.

17. Woodman never gave any express consent to the erection of the dam, nor to the purchase by Thomas.

18. It was a matter of general notoriety that Woodman objected to the diversion of the water of the Little Arkansas river into Chisholm creek above his premises, he having written articles and had them published in the city papers, setting forth his objections. The articles were written after the purchase by Thomas.

19. Thomas swears that when he told Woodman that he intended to purchase the mill property, that he also said that he intended to spend several thousand dollars in the improvement of the same, and that Woodman expressed his satisfaction thereat, and said that he was glad that some one with the requisite capital was going to take hold of the property and make it a paying investment. Woodman swears that he has no recollection of the conversation, and denies expressly that he expressed himself as pleased. On the other hand, he swears that he always objected to the use of the water-power, and whenever he said anything about the subject he always urged that some one with the requisite capital take hold of the property and run it by steam power. From this testimony, in the light of the other testimony in the case, the court cannot find that Woodman gave any express consent to Thomas to use the water-power in running the mill, and the court cannot find that the conversation was of such a character as to leave Thomas to believe that Woodman had no objections to the diversion of the waters of the Little Arkansas river, for the purpose of a water-power.

21. The Little Arkansas river runs through lands which are underlined with a mixture of sand and gravel, through which the water percolates, by which the channel below the dam is fed; and hence there is at an ordinary stage of water a current in the river below the dam, but the current is very much impeded and more or less sluggish, and especially so where the river passes through and by the premises of the

plaintiff; and it is by reason of this that the channel becomes clogged with sand bars, especially at the mouth of the river, and more especially when the Big Arkansas river rises without a corresponding rise in the little river.

22. The plaintiff in the fall of 1876 visited the dam when it was five feet high, and walked across the same. The dam was afterward washed out and rebuilt twice to the same height.

23. If the owners of the mill are compelled to abandon the dam on the Little Arkansas, the waters of Chisholm creek will be valueless as a water-power.

24. The mill machinery is so constructed that it may be operated by steam power, in which case the owners would be subjected to a considerable loss and expense.

25. The plaintiff never commenced any action to restrain the building or maintaining of said dam and the diversion of the water from the Little Arkansas, until he commenced this action.

26. Before Thomas purchased the property, he took legal advice as to the validity of the proceeding to obtain the right to divert the water from the Little Arkansas river, and was advised that the proceedings were valid. He believed this advice was correct, and gave him the right to divert the water.

27. The plaintiff discovered that the dam caused the water to stagnate and the grass or moss to grow, as above stated, in the summer of 1876.

28. When the river is swollen by heavy rains, no inconvenience results to the plaintiff, and if any grass has grown in the water it is washed out by high water, and the channel remains pure and abundant until the water subsides to an ordinary stage, and sufficient time elapses with low water to enable the grass to grow again.

29. In the trench or race-way there is a water gate which, when open, lets the water through Chisholm creek and to the mill, but when closed shuts off the water from Chisholm creek, and at the time the channel of the river is *fuller* and the current stronger than when the water gate is open. This has the effect to impede the growth of the grass, and as there will naturally be frequent occasion to shut down the water gate, and as there are frequent freshets which swell the river, the water of the river below the dam will generally be pure and sufficiently abundant to prevent any inconvenience to the plaintiff, but there is a probability at any time of a reoccurrence of the conditions which will cause an inconven-

ience and loss of comfort to the plaintiff and a depreciation of the value of his property, by reason of its proximity to the river bank, all this resulting from the stagnation of the water, the growth and decay of the grass, as has been above described.

Thereon the court made the following conclusions of law:

1. The plaintiff is entitled to have the waters of the Little Arkansas river run in its natural channel upon his premises, and he is entitled to all the water, and there is no law of this state by which he may be deprived thereof, without his agreement or *laches*.

2. The owner of land upon which there is a stream of water, who without objection sees another divert the water from his premises for manufacturing purposes, and knows that such person is expending large sums of money in the erection of buildings, works and machinery, which will be comparatively of little value without the water so diverted, such owner, by his acquiesence, is held to lose his right to the water, and will not afterward be permitted to assert and maintain such right, so as to occasion great loss to the party so using the water.

3. This rule extends to cases where the results of the diversion of the water are natural, direct and necessary, and does not extend to cases in which the results were unforeseen, and could not be calculated upon with reasonable certainty. In this case, the court finds that while Woodman was charged with notice of the erection of the dam, and that the purpose was to divert the water of the Little Arkansas from its natural channel, owing to the peculiarities of the channel, the formation of the surrounding country, and the percolation of the water through the under strata of sand and gravel, he could not calculate with any degree of certainty what amount of water would be diverted, nor could he foresee that the grass would grow and fill the water, and decay, and make his premises undesirable.

4. The owner of the land may also lose his right to the water by lapse of time, if he fails in due time to assert his right, by which third persons are induced to invest money, in the reasonable belief that no such right will ever be asserted. It is for the court to determine whether, from all the circumstances, it would be inequitable and unjust to allow the assertion of such right, and this is a question addressed largely to the judicial conscience and discretion.

5. In this case the court finds that Woodman has not unreasonably delayed the beginning of his action. It could not have been fairly presumed at the time Thomas and Ellis and Lewis and Fraker purchased the mill that Woodman had abandoned his right. It may fairly be presumed, from all the circumstances, that the delay was for the purpose of investigation and trial, in order to determine whether his injuries were such as to entitle him to relief in a court of equity.

6. The court concludes that Woodman is entitled to the relief demanded, and the defendants will be perpetually enjoined from maintaining the dam complained of, and from diverting the water of the Little Arkansas, as charged in the petition.

Judgment was entered accordingly in favor of *W. C. Woodman;* the dam was ordered to be removed an dthe race-course filled up, and the defendants enjoined from rebuilding the dam or opening the race-course, and from diverting the water from the Little Arkansas river into Chisolm creek.

The defendants bring the case here.

*H. G. Ruggles,* for plaintiffs in error:

The defendant in error is not entitled to the relief which he asks. He is conclusively estopped by his acquiescence in the building of the dam complained of, and the mill and the improvements connected therewith — of all of which he had early and full knowledge — and by his delay in bringing this action, or in any other manner making known his dissent from building and maintaining said dam. Equity will not grant him relief, but will leave him to pursue his remedy at law for damages. When the work was begun he ought to have interposed his objection, and if it was not stopped, he should then have brought his action; equity would then have entertained his suit, but now it will not. *Birmingham Canal Co. v. Lloyd,* 18 Ves. Ch. 515; *Venard v. Cross,* 8 Kas. 257; *Sheldon v. Rockwell,* 9 Wis. 166; *Bankart v. Houghton,* 27 Beav. 425; 16 id. 630; 2 Sim. Ch. (N. S.) 162; 15 N. H. 324; 54 Ga. 178; 37 Md. 237; 20 N. J. Eq. 531; 9 Wall. 245; 30 N. Y. 520; 17 Vt. 387; 2. Disney, 100; 18 Wis. 191; 15 Ohio St. 64; 6 id. 137; 18 id. 169; 29 id. 500;

Kerr on Injunctions, 299; Bigelow on Estoppel, 497; Wood on Nuisances, § 796; 1 Johns. Ch. 344; 2 N. Y. 281; 6 Kas. 306.

*Sluss & Hatton,* for defendant in error :

The facts as proved and admitted by the pleadings do not disclose the existence of a single one of the essential elements of an estoppel. (*Flower v. Elwood,* 66 Ill. 447; Bigelow on Estoppel, 480; 8 Kas. 189.)

Nearly, if not quite, all of the authorities cited on behalf of plaintiffs in error are based upon such a case as where one man, having an interest in land, stands by and sees another, who makes a *bona fide* claim to the same, expend money in the improvement of such land, *in ignorance* of the rights of the other. We find no case holding that one making such improvements *with knowledge* of the rights or claim of another can invoke an estoppel in his favor. The rule is, that there is no estoppel in such case. One who makes expenditures with the knowledge that another has or claims a right to the property, makes such expenditures at his peril. There is not a case cited which fits the facts of this case.

The point is made, that the defendant in error is estopped to maintain this action by reason of his *laches* in bringing it. What would be unreasonable delay in such a case, is a question principally of fact. The court below found that under the circumstances of this case, Woodman was not chargeable with unreasonable delay in bringing his action. Unless the facts are such as to enable this court to say that it is clear that the court below erred, the finding upon this point should not be disturbed.

The opinion of the court was delivered by

HORTON, C. J.: In our view of this case, owing to the conduct of the defendant in error, it is unnecessary to decide what rights the original proprietors of the flouring mill obtained under the condemnation proceedings, instituted by them in 1874, for the purpose of diverting water from the Little

15 — 23 KAS.

Arkansas river into Chisholm creek, or to construe § 1, ch. 66, Comp. Laws 1879, relating to the turning of an adjacent stream or spring into another stream. This leaves only one question for our determination: Whether the defendant in error is estopped by his silence and acquiescence in the construction and continuance of the dam and race-course in controversy, from obtaining the interference of a court, sitting as a court of equity, in his behalf as prayed for by him in his petition? In brief, whether said defendant in error has by *laches*, or his own acts, deprived himself of the right to ask equitable relief? The trial court in its conclusions of law fully recognizes the doctrine that the owner of land may lose his right to the flow of water in its natural channel upon his premises, by permitting others to expend large sums of money in diverting the water for manufacturing purposes, and failing to commence his opposition when he could have done so with justice. An attempt is made, however, to except this case from the general rule, on the theory that where the results of the diversion are unforeseen, and cannot be calculated with reasonable certainty, the rule is not applicable. It may be true, that where a person has acquiesced in the erection of certain works diverting water from its natural flow upon his premises under an erroneous opinion, and in ignorance of the consequences to him, that he is not afterward estopped from all remedy, if at a subsequent period he sustains serious injury, unforeseen when the works were commenced. Generally, a mistake of fact is not binding upon one who acts in ignorance of the real condition of affairs; but if all the parties are equally mistaken in the resultant consequences, another important principle at once enters into the consideration of such cases in the courts, which is: Can the parties be placed in exactly the same situation as they were in when the first act was done by one side and acquiesced in by the other? If that cannot be done, a court of equity will weigh the hardships of the case, the justice or the injustice of stopping such diversion, and will grant or refuse orders of injunction or for abatement, as shall be most in consonance with the equities of all the

parties. If possible, the inconveniences of the parties will be regarded; and to balance these inconveniences and the injuries of parties thus acting toward each other, when inconveniences and injuries unexpectedly ensue, equity will generally decline to interfere on either side, but leave the parties to their legal rights and their legal liabilities. In a legal action, damages may be recoverable, in many cases, when the *laches* of a party deprives him of the right to the interposition of equity in his behalf. If we assume that the defendant in error acquiesced in the construction of the dam, race-course and mill, in ignorance of the ultimate consequences, we must also assume that the original proprietors of the mill were equally ignorant; in other words, that neither knew the injurious consequences of the diversion of the water into Chisholm creek, and therefore, as both parties were equally mistaken, and cannot be placed in exactly the same situation as they were originally in, equity ought not to interfere on either side, but leave the parties to their legal rights and liabilities. The conclusion, therefore, of the trial court, was erroneous, in holding that the plaintiffs in error should be restrained from maintaining their dam upon the Little Arkansas, and from diverting the water therefrom, notwithstanding the acquiescence and delay of the defendant in error, on the ground that such acquiescence and delay were no bar to the interposition by injunction and like orders, in view of the unforeseen consequences arising from the grass growing and decaying in the river. The findings of fact show that if the orders of the trial court are executed, the waters of Chisholm creek will be valueless as a water-power, the dam and race-course will become useless, and that the mill must be run by steam, if run at all, which will cause loss and expense. Under these orders, all the loss would be thrown upon the plaintiffs in error. This would be greatly inequitable, considering the action of the defendant in error.

Further, the conclusion of the court, set forth in the findings of law, to the effect that the defendant in error was not guilty of unreasonable delay in bringing his suit, is not sustained by the findings of fact. By these findings, it appears

that in the summer of 1876, he knew the full consequences to his premises of the diversion of the water from the Little Arkansas river, and in the fall of that year visited and walked across the dam. Thereafter he could not plead ignorance of the real facts in the case. Yet he permitted the dam in the river to be twice rebuilt to the same height, after the fall of 1876, and made no serious objection. He waited till March, 1878, to commence any legal opposition, and. therefore, in our opinion, has been guilty of improper delay in applying to the court for equitable interference in his behalf. He has acted in such a manner as estops him from the assertion of any right to the interposition of a court of equity. Whether he has also deprived himself by his conduct of all legal remedies, we need not now decide. The conclusions we have reached dispose finally of this case. (*Bankart v. Houghton*, 27 Beav. 245; *Birmingham Canal Co. v. Lloyd*, 18 Ves. 515; *Sheldon v. Rockwell*, 9 Wis. 166; *Tichenor v. Wilson*, 8 N. J. Eq. 197; *Burden v. Stein*, 27 Ala. 104; *Water Lot Co. v. Bucks*, 5 Ga. 315; *Jacox v. Clark*, Walker's Ch. 249; *Sprague v. Steere*, 1 R. I. 247; *Gray v. O. & Pa. Rld. Co.*, 1 Grant's Cases, 412.)

The judgment of the district court will be reversed, and the case remanded with direction to the court to deny the relief demanded by the defendant in error, and to render judgment in favor of the plaintiffs in error for all costs.

All the Justices concurring.