LEVI WHIPPLE

*v.*

WILLIAM WHIPPLE *et al.*

*Filed at Ottawa March 26, 1884.*

1. CANAL LANDS—*certificate of purchase, as merely a chose in action—not vesting the legal title.* A certificate of purchase of canal land, issued by the canal officers, reciting the purchase and price and amount paid down, and stating that on payment of the residue of the purchase price, with interest, the party purchasing, or his assignee, would be entitled to a conveyance, does not operate like a conveyance to transfer the legal title of the land therein described, to the holder or his assignee. It is simply a chose in action, made assignable by statute.

2. RESULTING TRUST—*in favor of one paying for land, the equitable title being apparently in another.* A person in possession of a tract of canal land, when the canal lands were put in market sent by another the money necessary to make the first payment, and requested the latter to purchase the land for him, which was done, the person transacting the business giving his own notes for the deferred payments, and taking the certificate of purchase in his own name. The one for whom the land was bought paid all the purchase money, and received the certificate unindorsed: *Held,* that while the certificate showed the apparent equitable ownership in the person to whom it was given, yet in reality the equitable title was in him whose money paid for the land.

3. ASSIGNMENT *of certificate of purchase—whether a divestiture of title.* The equitable owner and holder of a certificate of purchase of a tract of canal lands, who was in possession of the land as owner, and who had paid all the purchase money, fearing that the holder of the equitable title might die, procured the latter to assign the certificate to an infant son of the real owner, who still continued to keep possession of the certificate, and never delivered the same to his son, or manifested any intention of parting with his title: *Held,* that the assignment to the son did not divest the father of his real equity or right to a deed, its only effect being to place the son in the same position as the trustee stood before, and that the father might rightfully erase the assignment to the son, and procure another one to one acquiring his equitable title by purchase.

4. FRAUDULENT CONVEYANCE—*equitable title not enforcible in favor of assignee—a trust will not arise from a fraudulent transfer.* If an assignment of a certificate of the purchase of canal land is caused to be made by a father, the equitable owner, to his son, to defraud supposed creditors of the father, but the same was never delivered, the son, even though

an infant at the time of the transfer, can receive no aid from a court of equity in the assertion of any claim under the assignment, as against a purchaser from the real owner. By ratifying his father's act, he ratified it as it actually was, and thereby made himself a party to the fraudulent transaction. But if the certificate, with its indorsement, had been delivered to the son for the purpose of vesting him with the apparent title, and the father had sought in equity to set aside the assignment, it might well be said that no trust in favor of the father could be raised upon a fraud.

5. LACHES—*delay in asserting title to land.* The equitable owner of a tract of land caused the holder of a certificate of purchase of the same to assign it to the son of the former, in 1851, not for the purpose, however, of passing the title, which fact the son knew before he became of age, which was in 1867, and he also knew that the father claimed to be the owner of the land, and paid all taxes from 1851 to 1882, (more than thirty years,) which claim the son recognized repeatedly, and when he rented part of the land of his father, paid him rents therefor, and received pay for all improvements he put on the same while tenant, and stated to the purchaser from his father that he had no objection to his purchasing of his father. The son, in 1882, filed his bill to set aside the sale made by his father, asserting title in himself. It was *held,* the *laches* of the son in asserting his rights, if any, was a bar to the relief sought.

APPEAL from the Circuit Court of Grundy county; the Hon. FRANCIS GOODSPEED, Judge, presiding.

In 1844, William Whipple took possession of and broke eighty acres of canal land, situated in Grundy county. In 1845 he built a house upon it. In June, 1846, he moved his family into the house, and continued to reside there until 1882, with the exception of the years 1873 and 1874, during which he rented the place and received the rents therefor. During all this time he held undisputed possession, claiming as owner. In 1848 the land was put into the market by the canal trustees. William Whipple gave Orville Cone sufficient money with which to make the first payment on the land, and requested him to attend the land sale and bid off the eighty. Cone did so. He bid off the land, made the first payment, executed his individual notes for the deferred payments, and took the canal certificate in his own name, and on his return from the land sale gave the certificate to Wil-

liam Whipple. William Whipple paid all of the notes executed by Cone for the deferred payments, and retained the certificate in his possession until February, 1882, when he sold the eighty to Hoge, one of the defendants. William Whipple paid all the taxes assessed against this land from the time of the purchase until 1882.

William Whipple signed a note as security for one Kimball, in 1839. In 1843 he learned that the note had not been paid. He was never sued upon it. Some person, in 1843, made some inquiry of him regarding it, and he answered that it was not for him to pay it. He never heard of the note afterwards. William Whipple allowed the certificate to remain in the name of Cone, because he feared that this note might not have been paid, and might be sued on. William Whipple, in 1851, fearing that Cone might die, took the certificate to Cone, and requested him to assign it to his son, Levi Whipple, the complainant, who was then an infant, some five or six years old. After the assignment, which was written on the back of the certificate, William Whipple took possession of the certificate, and retained it. It was never delivered to Levi Whipple. The assignment was not made for the purpose of conveying the title to the land to Levi, or the title to the certificate, but "simply to put it in such shape that William Whipple could control the certificate," William Whipple thinking, at the time, that after Levi became old enough to write he would willingly assign it over to him. Levi Whipple first learned that the certificate had been assigned to him when he was ten or twelve years of age. When he was sixteen years of age his father asked him if he knew how the title stood. He replied that he did. His father said to him: "Some time or other we will take a ride up to Lockport and have it fixed." In 1867, when Levi Whipple became of age, he left the homestead, married, and lived upon other land than that in question. In 1871 he rented this eighty from William Whipple, and continued in such tenancy until

the spring of 1873, paying to William Whipple, as rent, one-third of the crops. In 1873, at the end of his tenancy, he moved away, charged William Whipple for all the improvements which he, during his tenancy, had placed upon the premises, and William Whipple paid him for them.

In 1880, Isaac Hoge, one of the defendants, was desirous of buying two acres of this eighty, to be used for a road. He asked Levi Whipple if he had any objection to his buying the two acres of William Whipple, and paying him $100. He replied that he had no objections. In January, 1882, Hoge was desirous of buying the eighty. He saw Levi, and told him that he thought of buying the property from his father, and asked him if he had any objections,—if he was willing that he (Hoge) should buy the place of his father, William Whipple. Levi answered that he had no objections to his (Hoge) buying the place of his father, William Whipple, if his father and he (Hoge) could agree on the price. Hoge asked him if he would assign the certificate. He replied that he had no objections, but his sisters did not want him to. He never claimed to Hoge that he had any right or interest in the property. As soon as Levi Whipple learned that Hoge was talking of buying, he went to William Whipple and tried to buy the property. William Whipple told him that he had given the refusal to Hoge, but if Hoge did not take it he could have it. Levi offered to pay down $1000, but William Whipple told him he could not get along with less than $2000. Levi replied: "If you will wait a few days, I think I can raise you a couple of thousand dollars, and will pay you the balance in two or three years." On the 6th day of February, 1882, William Whipple erased the assignment of Orville Cone to Levi Whipple from the back of the certificate, and Cone, at the request of William Whipple, made a new assignment of the same upon the back thereof to defendant Hoge. On the same day William Whipple and wife executed and delivered, together with the certificate so assigned,

a warranty deed of the eighty to Hoge, and put him into possession of the land. Hoge paid to William Whipple $4000 in cash, the full price of the purchase.

On the 27th day of September, 1882, Levi Whipple filed his bill in chancery, in the circuit court of Grundy county, upon the above stated facts, and made William Whipple and wife, Cone, Hoge, and the subsequent grantees of Hoge, parties defendant therein, and praying that William Whipple and Hoge be decreed to surrender the certificate to complainant; that the assignment from Cone to Hoge be declared null and void; that the assignment from Cone to complainant be declared to be in full force and effect; that the deed from William Whipple and wife to Hoge be declared null and void; that complainant be declared the rightful and equitable owner of said property; that possession be ordered to be surrendered to complainant, and for such further relief as equity may require. The complainant was thirty-six years of age when the bill was filed. Upon a hearing, the circuit court dismissed complainant's bill, and as the question in controversy involves a freehold, the record comes to this court upon the appeal of complainant.

Messrs. DOUD & WING, for the appellant.

Mr. E. SANFORD, for the appellees.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

Counsel for appellant seem to assume that an assignment of a certificate of purchase issued by the canal officers, is in all respects the equivalent of a deed of conveyance, by which, under our laws, the legal title to land may be transferred from one to another. This is a misapprehension. The certificate of purchase is not set out in the bill, or its contents found in the record. We must assume that it was simply a statement that Cone had bought the land at a price given,

made one payment, of a given amount, down, and upon the making of the deferred payments, with interest, he would be entitled to a conveyance of the legal title of the land to him or to his assigns. This is not a conveyance of land. It is simply a chose in action, made assignable by our statute. The money was all paid by William Whipple, and when the payments were all made, he, in equity, was entitled to a conveyance. The certificate was merely *prima facie* evidence. It showed the apparent equity in Cone, when in fact it was in William Whipple. This evidence (the certificate) was in the possession of William Whipple, who was also in possession of the land as owner and in his own right. At his request, and while the certificate was still in his possession and under his control, Cone indorsed upon the same an assignment to Levi Whipple, which placed the apparent equity, or right to a deed, in him,—but this did not divest William Whipple of his real equity or right to a deed. The assignment was not made for that purpose. It was made to place Levi in the same position in which Cone stood. No act of William Whipple, or of Cone, is shown manifesting any intention to divest William Whipple of any equity or right of his own pertaining to this land, or to give Levi any beneficial interest in the same.

It seems, however, to be thought that the rights of Levi are in some way strengthened by the allegation that the real purpose of Cone and William Whipple in having the certificate taken originally in the name of Cone, and in having the certificate afterwards assigned to Levi, was to delay and hinder supposed creditors of William Whipple, and we are asked to examine the proofs. If this charge be true, it would show that the supposed rights of Levi Whipple (to sustain which this bill is exhibited) are founded in fraud, and have no other foundation. In such case a complainant can have no aid from a court of chancery. It is said Levi, at the time of the assignment, was an infant, and had no personal part in the

fraud, and hence can not be unfavorably affected thereby. The case shows that he had no connection with the assignment, and that his father did not in fact accept the assignment *for Levi,* but *for himself.* If, however, we are to assume, as counsel insist, that the acceptance of the assignment by the father was for the son, and as his agent, then the act of the agent is the act of the principal, and in so far as such act is affected by the fraud of the agent, the rights of the principal are to the same extent affected. The agent, at the time of the act, had no authority from the principal. It could only become the act of the principal by his ratification. He can not possibly avail himself of the act by ratification— by anything short of ratification of the transaction as it actually was. If it was actually fraudulent, he ratifies the fraud, and is thereby excluded from seeking relief in a court of equity. Had the certificate with its indorsement been delivered to Levi for the purpose of vesting in him the apparent title, and had William come into a court of equity seeking to set aside the assignment to Levi, a very different case would have arisen. It might well have then been said, no trust in favor of William Whipple can be raised upon a fraud.

Aside from these considerations, the *laches* of appellant in asserting his rights closes the door against him in this suit. He knew before he came of age that this assignment was in his name. He knew that instead of recognizing him as the real owner in equity of the land, his father claimed to own the same in his own right. He recognized this claim of his father, rented part of the land from his father, paid to him rent, and received payment from his father for improvements made by him during his tenancy. He became of age in 1867, and it is not until 1882 he seeks to assert his supposed rights. His father was in possession, claiming as owner, and paying all taxes upon the land, from 1851 to 1882,—more than

thirty years, and for more than fifteen years after complainant ceased to be a minor.

In any view of this case, the decree of the circuit court was, in our judgment, right. The decree is therefore affirmed.

*Decree affirmed.*

Mr. JUSTICE WALKER: I concur in the conclusion reached, on the ground, alone, that complainant gave his full consent that Hoge might purchase the property, and acting on that consent he did purchase, and paid $4000 for it, and it would be a monstrous fraud on Hoge to permit complainant to recover. He is manifestly estopped by that consent from now claiming the title, and the bill was properly dismissed.