DETERMINED IN

# THE SUPREME COURT

OF THE

# TERRITORY OF NEW MEXICO.

[No. 802. February 28, 1901.]

## C. EWING PATTERSON et al., Appellants, v. JOHN Y. HEWITT et al., Appellees.

### SYLLABUS.

1. Where claimants of conflicting mining claims, enter into a verbal agreement by the terms of which all of their former locations should be abandoned; that certain new locations should be made in the name of one of the parties, on condition that each of the parties shall perform their pro rata share of the work neces-. sary to make and maintain such new locations and procure patents for the same; one of the parties left the Territory in 1883, prior to the performance of his share of the labor required, leaving agents to represent him, and another left the Territory in 1885, after such work was performed and a demand for deed was made, leaving agent who also made demand for deed, which was refused; in the absence of these non-residents, the other claimants performing their pro rata share of the labor required, and other parties, contributed large sums of money, and performed a large amount of labor for several years, for the development of the claims—which were of purely speculative value when the non-resident claimants left the territory—the result of which was the discovery and extraction of large quantities of valuable ores, and in great enhancement in the value of the property in the year 1890 and subsequent years, to the accomplishment of which results, neither the non-resident claimants nor their agents contributed either money, labor, or in any manner whatever. April 23, 1893, said non-resident claimants, C. Ewing Patterson and Henry J. Patterson, brought suit to recover a

Patterson v. Hewitt.

one-fourth interest in said mining claims, and also for an accounting for money received from ores taken therefrom, and for the enforcement of a trust, alleging performance of labor and demand for deed prior to the departure of Henry J. Patterson in April, 1885, and also the failure and refusal of John Y. Hewitt who made the locations, to execute and deliver deeds, etc. *Held*: that under the circumstances of this case, the complainants were guilty of laches in equity, in failing to institute proceedings to enforce alleged rights accruing eight years prior to the commencement of suit, and that a court of equity will not aid in the enforcement of stale claims, where the circumstances show that the enforcement would be inequitable.

2. Where a case is of purely equitable cognizance, in the application of the doctrine of laches, courts of equity act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, and refuse to interfere where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights.

3. In such case, the statute of limitations does not necessarily govern the court in the application of laches.

4. Sections 2916 and 2930, Comp. Laws, 1897, applies limitation to trusts founded upon verbal agreements or unwritten contracts, where the defendant has not fraudulently concealed his cause of action or the existence thereof, from the party entitled or having a right thereto, and there was no such concealment in this case.

Appeal from the District Court of Lincoln County, before H. B. HAMILTON, A. J.    Affirmed.

### STATEMENT OF FACTS.

This case was begun on the twenty-ninth of April, 1893, in the district court for Lincoln county, by the filing of a bill of complaint on behalf of C. Ewing Patterson, a resident of New Jersey, and Henry J. Patterson, a resident of New Mexico, against John Y. Hewitt, William Watson, Mathew Hoyle and Harvey B. Fergusson, residents of New Mexico and Old Abe Company, a New Mexico corporation.

The appellants sue to enforce a trust which is alleged to have existed between the appellants and Hewitt, and by virtue of which they seek to recover a one-fourth interest in two mining locations made in the name of

John Y. Hewitt on the second day of May, 1884; they also pray for an accounting of the proceeds of ores taken from the premises, for a lien upon the property, for an injunction and the appointment of a receiver.

The court at the conclusion of the testimony and the arguments of counsel, made numerous findings of fact and conclusions of law, and upon the fifteenth day of February, 1897, rendered a final decree dismissing appellant's bill at their cost. Appellants prayed an appeal which was granted and brought the case to this court.

The facts as found by the court are:—

"1. That the real estate or mining ground, known as the Old Abe mining claim, in controversy in this suit was about the year 1881 claimed by the complainants herein, and by one of the defendants, Watson, under the locations made by them of said ground, sometime in the year 1881; that between that time, the year 1881 and the year 1883, the complainants, in conjunction with the said defendant, Watson, did a large amount of work upon the said ground, and were claiming the same as the locators thereof under the mining laws of the United States.

"2. The court doth also find that the said ground was also at the said date, to-wit, between 1881 and 1883, claimed by other parties, among whom was the defendant, Hewitt, and others.

"3. The court doth further find that some time prior to August, 1883, some rich ore had been discovered within the boundaries of said ground by one of the complainants, Patterson.

"4. The court doth further find from the evidence that the said ground was, in August, 1883, in dispute between the complainants and the said Watson upon the one side, and the said other parties upon the other.

"5. The court doth further find that the said complainants and the said defendant, Watson, and all of the parties who were interested in said ground, held a

meeting in White Oaks in August or September, 1883, for the purpose of adjusting the difficulties then existing between them in reference to the said ground, and to endeavor if possible to arrive at an agreement whereby the interests of all parties in said ground would be protected and preserved; that at the said meeting there were present the two complainants and the defendant, Watson, and the defendant, Hewitt, and some other persons who were interested in said ground.

"6. The court doth further find, that at the said meeting it was then and there agreed by and between the complainants herein and said defendants, William Watson and John Y. Hewitt, and the other persons who were interested in said ground, that all of the old locations then existing upon the said ground, whether made by the complainants or any of the defendants or conflicting claimants therein, should be from that date abandoned, surrendered and given up by all of the parties, and that the said ground should be taken possession of by a trustee, who should locate the said ground in his own name, and hold the same as trustee for the benefit of all the parties then interested in said ground.

"7. The court doth further find, that it was agreed that the said John Y. Hewitt, the defendant herein should be and was designated and agreed upon as a trustee, with direction and authority to locate the said ground in his own name, and to hold the same as trustee for all of the parties in interest; and it was further agreed by and between the said parties claiming the said ground, as well the complainant as the defendants Watson and Hewitt, and the other persons interested therein, that sufficient work should be done upon the said ground in order to discover mineral upon the said ground, and to obtain a patent therefor; and it was further agreed that said Hewitt, as such trustee, should make a deed to each of the said parties holding an interest therein, who should contribute his part of the work and labor and expenses in doing the necessary

work in order to obtain the said patent; but there was no agreement as to what should become of the interest of any one who failed to contribute his share of the expenses. It was also agreed that each of the said complainants, should he contribute his share of expenses, should receive a one-eighth interest in said location so made by said Hewitt; and that the said Watson should also receive an eighth interest, and the said Hewitt should receive an eighth interest, partially on account of his services, and in part on account of his interest in the ground, and that the remainder of said property should go to the other parties who were interested therein.

"8.    The court doth further find, that after the said agreement was made the said Hewitt took charge of said property thereunder; that the said Watson, defendant, and one of the complainants, Patterson, superintended and directed the work upon the said mine during the year 1883, and part of the year 1884.

"9.    The court doth further find, that there was a one-sixth interest in said mine which it was agreed should be sold, and which was sold to H. B. Fergusson for the sum of five hundred dollars, which sum of money was to be used and was used in the working and development of the said mine after the said compromise agreement.

"10.    The court doth further find, that after said compromise agreement, in August or September, 1883, down to April, 1885, a large amount of work had been done upon the said property, to obtain a patent therefor, and sufficient to discover mineral thereon.

"11.    The court doth further find, that after said compromise agreement of August, 1883, there was contributed, either by the complainants themselves, or for them sufficient means and labor to pay their proportionate shares of the work upon the said mine to obtain a patent and to entitle them to the deed therefor.

"12.    The court doth further find, that in April,

1885, the complainants herein had complied with their part of the agreement sufficiently to entitle them to a deed from the said John Y. Hewitt, as such trustee, for their one-eighth interest each in and to said mine under said agreement.

"13. The court doth further find, that the said Henry J. Patterson in person and by his agent did in April, 1885, demand a deed from the said John Y. Hewitt to his one-eighth interest in and to said mine, but that the said John Y. Hewitt, the defendant herein, declined and refused to make the said deed to the said Henry J. Patterson, for his interest therein.

"14. The court doth further find, that the said Hewitt, as such trustee, has never made the said deed, but has always declined and refused to make the same, and has disputed the right of the said Patterson to his deed to the said one-eighth interest in said mine under said agreement.

"15. The court doth further find, that the said C. Ewing Patterson demanded his deed to the said one-eighth interest in said Old Abe mine of and from the said Hewitt, the defendant herein, immediately prior to the date of the institution of this suit; that no demand was ever made by the said C. Ewing Patterson prior thereto, but that the said Hewitt, the defendant herein, failed, neglected and refused to make, execute and deliver any deed for said interest to said C. Ewing Patterson.

"16. The court doth further find, that the said defendants herein, John Y. Hewitt, William Watson and H. B. Fergusson, during the years 1885, 1886, 1887, 1888, and 1889, and up to the year 1890, did and performed a large amount of work and expended a large amount of money on the said Old Abe mine, in addition to the annual assessment required by the government of the United States thereon; that neither of the said complainants have ever contributed or offered to contribute any part of the said expenses of said work and labor.

"17. The court doth further find, that in November, 1890, the said defendants, Watson, Fergusson, and Hewitt, discovered a large body of rich ore upon the said mine, and since said date have taken out a large amount of gold ore from the said property, amounting to several hundred thousand dollars, the exact amount of which which does not appear from the testimony herein.

"18. The court doth further find, that about the month of ——, 1892, a corporation known as The Old Abe Mining Company was organized by said Hewitt, Fergusson and Watson, and others, and that the said ground, known as the Old Abe ground in controversy herein, including the said one-eighth interest each, so claimed by said C. Ewing Patterson and said Henry Patterson, was by said Hewitt deeded to said Old Abe Mining Company, and that the said mining company is now claiming title thereto, and that the stock of said company was divided so that Hewitt held one-third, said Watson one-third, said Fergusson one-fourth, and one forty-eighth each to four Wheeling parties, associated with Mr. Fergusson in his original purchase of one-sixth of the property, and the capital stock remained so divided at least down to the time of the taking of defendant's testimony in this case in January, 1896.

"19. The court doth further find, that the said C. Ewing Patterson left the Territory of New Mexico and removed to the State of New Jersey in the year 1883 and has never since returned nor resided in this Territory.

"20. The court doth further find, that the said Henry Patterson left White Oaks, New Mexico, about the latter part of March (April) 1885, and that after that time to the fall of 1892, he was a non-resident of this Territory, living in California, Arizona, and other places on the Pacific coast.

"21. The court doth further find, that since the said Henry Patterson left this Territory, in April, 1885, neither he nor the said C. Ewing Patterson have in any way or manner contributed any means or labor for the

development or improvement of said mine, and had taken no steps whatever, prior to the bringing of this suit, to enforce their rights or interests in said property, or to require the said Hewitt to carry out his agreement of August and September, 1883. That from April, 1885, to a short time prior to the date of the institution of this suit in 1893, the said Henry Patterson and C. Ewing Patterson were both out of this Territory, and took apparently no interest in said property, and made no effort in any way to enforce their rights thereunder until the date of the institution of this suit.

"22. The court doth further find, that the said Henry Patterson through his agent, Henry Burgess, had knowledge that the said defendant, Hewitt, had declined, neglected and refused to carry out the said agreement and make to him and his co-complainant deeds to the interests which they claimed in and to said mine; that he had such notice, first, in April, 1885, and that he had such notice again in the summer of 1887, and that he, with his co-complainant, C. Ewing Patterson, through information received, were fully advised after April, 1885, that the said Hewitt had refused to make said deed or carry out said trust agreement.

"23.   The court doth therefore find, as a conclusion from the proofs and evidence in this case, and the facts established that the complainants herein are barred from any right of recovery in this cause, and the bill herein should be dismissed.

"In accordance with the above and foregoing findings it is therefore ordered, adjudged and decreed by the court that said complainants take nothing by their writ, and that each party pay half the costs of this cause to be taxed against them and that execution issue therefor."

W. B. CHILDERS and F. W. CLANCY for appellants.

It is not necessary, in order to maintain their rights that all parties interested in a mining claim should contribute to the doing of the annual assessment work, provided that the work is done in the interest of the owners of such claim.

> Turner v. Sawyer, 150 U. S. 583-4.

Trustee may represent all parties interested in holding and development of a mining claim.

> Manville v. Parks, 15 Mining Rep. 565.
>
> Hirbour v. Reeding, 11 Mining Rep. 514.
>
> Skillman v. Lachman, 23 Cal. 203.

Work done before location for the development of a mining claim, and money paid therefor, may be considered as a part of the $500.00 expenditure required before application for patent.

> U. S. v. Silver Mining Co., 24 Fed. 568.
>
> Good Return Mining Company, 4 Land Dec. 221.
>
> Trickey Placer, 7 Land Dec. 52.

Where a statute of limitation, applicable to equity and law alike exists an action will not be held stale on account of laches, until the limitation of the statute has accrued.

> Corning v. Stebbins, 1 Barb. Ch. 591.
>
> Varick v. Edwards, Hoffman's Ch. 417.
>
> Varick v. Edwards, 11 Paige's Ch. 291.
>
> Hill v. Nash, 19 Southern 710.
>
> Washington v. Soria, 19 Southern 487.
>
> Cross v. Allen, 141 U. S. 537.
>
> Byran v. Kales, 134 U. S. 126.
>
> Hammond v. Hopkins, 143 U. S. 250.
>
> Galliher v. Caldwell, 145 U. S. 368.
>
> Halstead v. Grinnan, 152 U. S. 416-7.
>
> Penn Mutual Life Ins. Co. v. Austin, 168 U. S. 698.
>
> Abraham v. Ordway, 158 U. S. 420.

Mere delay or silence, no matter how long continued, does not constitute a bar, if it does not extend beyond the statutory period of limitations.

Viel v. Judson, 82 N. Y. 32.

Rubber Company v. Rothery, 107 N. Y. 315-6.

And silence for a period shorter than the statute of limitations does not estop, unless it has misled another to his hurt.

Hill v. Epley, 31 Pa. 334.

Railroad Company v. Dubois, 12 Wall. 64.

American Company v. Bradford, 27 Cal. 360.

Lux v. Haggin, 69 Cal. 267.

Wood on Limitations, secs. 61, 62, and 63.

Kline v. Vogel, 90 Mo. 250-1.

Perry on Trusts, sec. 850.

Galliher v. Caldwell, 145 U. S. 368, 12 Sup. Ct. 837.

Shorter v. Smith, 56 Ala. 208.

Scriggs v. Land Company, 86 Ala. 173, 5 South. 440.

Walter v. Nelson, 18 Southern 155 (Alabama).

It is only when silence becomes a fraud that it operates to postpone.

Beauland v. McKeen, 4 Casey 124.

Robinson v. Justice, 2 Penn. 19.

Keeler v. Ventuyle, 6 Barr. 253.

Dezell v. Odell, 3 Hill 215.

Patterson v. Lytle, 1 Jones 53.

One is not relieved if he has the means of becoming acquainted with the extent of his rights.

Crest v. Jack, 3 Watts 240.

Hepburn v. McDowell, 17 S. E. R. 383.

Knoff v. Thompson, 4 Harris 361.

1 Story Eq. 391.

The element of fraud is essential, either in the intention of the party estopped, or in the effect of the evidence which he attempts to set up.

Henshaw v. Bissell, 18 Wall. 271.

Beddle Boggs v. Mining Company, 14 Cal. 368.

Davis v. Davis, 26 Cal. 23.

Com. v. Moltz, 10 Pa. 531.

Copeland v. Copeland, 28 Me. 539.

Delaplaine v. Hitchcock, 6 Hill 616.

Haws v. Merchant, 1 Curt C. C. 136.

Zuchtmann v. Roberts, 109 Mass. 53.

Brandt v. Virginia Company, 93 U. S. 336.

Ross v. Payson, 43 N. E. 402.

See, also, Johnston v. Standard Mining Company, 148 U. S. 370.

Hanner v. Moulton, 138 U. S. 495.

W. L. WARREN and H. B. FURGUSON for appellees.

Laches, unlike limitations is not a mere matter of time, it is principally a question of the inequity of permitting the claims to be enforced; an inequity founded upon some change in the condition or relation of the property or parties.

Galliher v. Caldwell, 145 U. S. 368 (13 Sup. Ct. R. 874).

Badger v. Badger, 2 Wallace 94.

Harwood v. Railroad, 17 Wallace 78.

McQuiddy v. Ware, 17 Wallace 91.

Twin Lick Oil Company v. Marbury, 94 U. S. 587.

Sullivan v. Railroad, 94 U. S. 807.

Brown v. County of Buena Vista, 96 U. S. 157.

Hayward v. Bank, 96 U. S. 611.

Holegate v. Eaton, 116 U. S. 33 (6 Sup. Ct. Rep. 224).

Davison v. Davis, 125 U. S. 90 (8 Sup. Ct. Rep. 825).

Societe Fonciere v. Milliken, 135 U. S. 304 (10 Sup. Ct. 823).

Hall v. Russell (Oregon U. S. Circuit Ct.), vol.

11, Fed. Cases, p. 648; affirmed in 101 U.
S. 503.   Also reported in 3 Sawyer 506.

Manning v. Hayden (U. S. Circuit Ct.), vol.
16, Fed. Cases, p. 645; :. c., 106 U. S. 586
(First Sup. Ct. Rep. 617).   Also reported
in 5 Sawyer 306; 7 Reporter 428; 13 West
Jur. 317.

Lakin v. Sierra County, 25 Fed. 337,

Inexcusable delay for a period short of the time
prescribed by the statute constitutes laches, and is an
equitable defense, wholly independent and outside of
the statute, wherever the relief sought is wholly equit-
able.

Missouri holds this doctrine.

Bliss v. Prichard (1877), 67 Mo. 181.

Kline v. Vogel (Mo. 1886), 1 S. W. 733.

Tatum v. Holliday, 129 Mo. 426.

Landrum v. Union Bank, 63 Mo. 56.

Morseau v. Talbot, 55 Mo. 297.

Davis v. Fox, 59 Mo. 127.

The same doctrine is maintained in Alabama.

Scruggs v. Decatur, etc., 5 So. R. 441.

In New York the same doctrine is promulgated.

Calhoun v. Delhi, etc., 24 N. E. 27.

Haywood v. City of Buffalo, 14 N. Y. 540.

Town of Venice v. Woodruff, 62 N. Y. 462.

Town of Springfield v. Bank, 75 New York
397.

And see—

Waller v. Nelson (Ala.), 18 So. 154.

Frame v. Kenny, Am. Dec. 367 (Annotated).

Nettles v. Nettles, 67 Ala. 599.

James v. James, 55 Ala. 523.

Burgen v. Bennett, Gaines Cases (N. Y.) 19.

Sheldon v. Cockwell, 9 Wis. 166-184.

Novens v. White, 6 Johns. Chancery 360.

Kerr on Fraud and Mistake, p. 303, et seq.

Story, Eq. Jur., sec. 1520.

Pomeroy's Eq. Jur., sec. 817; also sec. 917 and note.

The application of the doctrine of estoppel by reason of laches, is an ancient power and principle of courts of chancery, strictly judicial in character, and existed long before any statutes of limitation were enacted.

Story, Eq. Jur., sec. 1520.

3 Pomeroy, Eq. Jur., sec. 817.

Pratt v. California, etc., Co., 24 Fed. 869, and cases cited.

Frame v. Kenny, 12 Am. Dec. 369 and note.

Calhoun v. Delhi, 24 N. E. 27, supra.

Any territorial legislation, contravening the provisions made by congress in the organic acts of the several Territories, is absolutely void.

Clayton v. Utah, 10 Sup. Ct. Rep. 190.

Ferris v. Highley, 20 Wall. 375.

The district courts of this Territory possess chancery as well as common law jurisdiction, and the Territorial legislative assembly has no power to repeal or abridge the same.

Orchard v. Hughes, 1 Wall. 73.

Ferris v. Highley, 20 Wall. 375.

Clinton v. Engelbrecht, 13 Wall. 434.

Clayton v. Utah, 132 U. S. 632, supra.

Old Colony Trust Company v. Dubuque, etc., Traction Co., 89 Fed. 794.

Hubbard v. Manhattan Trust Co., 87 Fed. 51.

Continental National Bank v. Hulman, 86 Fed. 514.

Pollard v. Clayton, 13 Mor. Mining 334.

Great West. Min. Co. v. Woodmas of Alston Min. Co., 23 Pac. 908.

Graff et al. v. Portland and Co., 54 Pac. 854.

Patterson v. Hewitt.

## OPINION OF THE COURT.

McFIE, J.—The court below dismissed the bill no doubt upon the ground that the appellants were without a remedy in a court of equity under the well-known and frequently applied doctrine of laches, and want of equity in appellants' bill.    This is apparent, not only from the decree of the court, but from the arguments of counsel in their briefs.    Counsel for the appellants insist, first, that the doctrine of laches as applied by courts of equity, is not applicable to this case, and, second, that if the doctrine of laches is available as a defense in this action at all, the delay must have been for the full period of the statute of limitations applicable to actions relating to real estate, which appellants insist is ten years.    Counsel for appellees plant themselves squarely upon the equitable doctrine of laches as a complete defense to this action, and that the application of the same is not controlled by the statute of limitations.    They also insist, that if a trust relation existed between Hewitt and the appellants, and appellants are seeking to enforce rights acquired by them under such trust relations, the appellants are barred both by the statute of frauds and sections 2916 and 2930 of the statute of limitations, for the reason that if the trust relation existed at all, it was by virtue of an unwritten contract or agreement.    These are substantially the grounds upon which a reversal of this case is sought by the appellants, or an affirmance by the appellees.

Counsel on both sides in their briefs criticise some of the findings of fact by the court below, upon the ground that there is no substantial evidence to sustain the findings, but it is to be inferred at least from the remarks of counsel on that subject, that these criticisms are not made with a hope of having this court disregard the findings of fact by the court below; and it is substantially stated by counsel on both sides that it is expected that this court will decide this case upon the facts as

found by the court below, and that counsel are satisfied that the court shall do so.

There was a large amount of testimony taken in this case, and the same has been examined by the court. From this examination there is a substantial conflict in the evidence on the controverted points in the case, and such being the case, this court will abide by the findings of the trial court upon the questions of fact and determine the case upon the facts thus presented by the record.  ↪

Before proceeding to an examination of the law upon this issue, a brief summary of the facts will be appropriate.

The material facts as found by the court and which are pertinent to the issue of laches, are, that the agreement entered into at the meeting held in August or September, 1883, by which Hewitt was to locate the mining claims known as "The White Oaks" and "Robert E. Lee" lodes, and which were also denominated "The Old Abe" by the court below in his findings, and at which meeting the interests of the respective parties were agreed upon, was a parol or unwritten contract or agreement, and that no written contract or agreement was entered into between the parties for this purpose at any time; that Hewitt located these claims in his own name on the second day of May, 1884; that C. Ewing Patterson removed from the Territory of New Mexico to the State of New Jersey in December, 1883, and never returned to the Territory; that the work which it was agreed at that meeting should be done by the respective parties, was done by or under the supervision of Henry J. Patterson and William Watson after the date of that meeting and up to April, 1885, and if any labor was performed on behalf of C. Ewing Patterson during that time, it was by or under the direction of Henry J. Patterson and Watson, as his representatives; that demand was made upon Hewitt for the execution of deeds conveying the interests of the Pattersons in said property to

them as early as April, 1885, and that both of the appel-
lants were fully advised and informed, and, therefore,
knew that Hewitt refused to convey to them any interest
in said property as early as April, 1885; that Henry J.
Patterson left the Territory of New Mexico in April,
1885, residing in Arizona, California and other places
and did not return until 1892; that Hewitt never did
convey to either of the appellants any interest in the
property in controversy, but on the contrary openly re-
fused to do so, both to the Pattersons themselves and to
Mr. Burgess, the attorney-in-fact of Henry J. Patterson,
and that both of the Pattersons had knowledge of the
refusal of Hewitt to convey as early as April, 1885; that
a large amount of work and labor was done upon the
property in controversy in the nature of assessment and
development work and for the improvement of the prop-
erty by appellees Hewitt, Fergusson and Watson during
the years 1885, 1886, 1887, 1888, 1889, and 1890, and a
large amount of money was expended by them upon this
property during those years, all of which labor and
money was done or expended by themselves and others
owning interests therein, and that neither Henry J. Pat-
terson nor C. Ewing Patterson performed any labor or
expended any money upon or contributed in any way
to the labor and expense of Hewitt, Watson and Fergus-
son during those years in the nature of assessment work
required by the Government or otherwise, or at any time
after April, 1885, nor did they or either of them manifest
any interest whatever in the property after Henry J.
Patterson left the Territory in April, 1885, nor did the
defendant, Burgess, attorney-in-fact, who resided in the
immediate vicinity of the property, perform any labor
or contribute any money towards the assessment work
or the development of the property in the absence of the
Pattersons; that the property was of little known value,
but on the contrary its value prior to the year 1890 was
entirely uncertain and speculative; that during the fall
of 1890 the development work done by Hewitt, Watson

and Fergusson and others, not including the appellants, resulted in the discovery of large bodies of rich ores in the mines located by Hewitt and referred to as "The Old Abe" mine; that the property at that time rapidly advanced in value and became of great certain value, and that several hundred thousand dollars' worth of valuable ores were taken from the property by the parties developing the same; that in ————, 1892, a mining company was organized by Hewitt, Watson, Fergusson and others and incorporated in the name of "The Old Abe Mining Company;" that Hewitt, Watson, Fergusson and others conveyed their respective interests in the property in controversy to the company, and that stock was issued by said company in lieu of the interests conveyed by the appellees who had acquired the interests of other owners in the property; that Hewitt in pursuance of his refusal to convey to the Pattersons any interest in the property, and evidently denying all interest in the property by them, conveyed the one-eighth interest of each of the Pattersons to the company, the entire property having been located in the name of Hewitt; that the agent, Burgess, left the Territory of New Mexico prior to the trial of this cause, and his place of residence being unknown, his attendance could not be procured as a witness, and his testimony could not be obtained at the trial of this cause.

Upon these facts the court below dismissed the appellants' bill, and this decree of the court is assigned for error by the appellants.

Proceeding then to a consideration of the law of laches, as applied to stale claims by courts of equity, it will be found that each case must be determined upon its own circumstances; that the courts have frequently held that no ironclad rule can be laid down applicable to all cases, but that the circumstances of each case must determine the application of the law of laches as the equities are shown by the evidence.   The reported cases

show that while the lapse of time is one of the elements to be considered in applying laches to stale claims, it is only one, and that it is not ordinarily the controlling or most important one to be considered by the court in applying laches as a defense in equity.

In the case of Knight v. Taylor, 1 Howard 168, the court said:

"We do not found our judgment upon the presumption of payment. For it is not merely on the presumption of payment, or the analogy to the statute of limitations that a court of chancery refuses to lend its aid to stale demands. There must be conscience, good faith, and reasonable diligence to call into action the powers of the court. In matters of account, where they are not barred by the act of limitations, courts of equity refuse to interfere, after considerable lapse of time, from considerations of public policy, and from the difficulty of doing entire justice where the original transactions have become obscured by time, and the evidence may be lost."

In Brown v. County of Buena Vista, 95 U. S. 161, the court said:

"Laches and neglect are always discountenanced, and, therefore, from the beginning of this jurisdiction, there was always a limitation of suits in this court. . . . Limitation of the actions was dictated by experience, and is founded in a salutary policy, as the lapse of time carries with it the memory and life of witnesses, the muniments of evidence and other means of proof."

In Badger v. Badger, 2 Wallace 87, the court says:

"But there is a defense peculiar to courts of equity founded on lapse of time and the staleness of the claim where no statute of limitation governs the case. In such cases courts of equity act upon their own inherent doctrine of discouraging for the peace of society antiquated demands, refuse to interfere where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights."

Patterson v. Hewitt.

In Twin-Like Oil Company v. Marbury, 91 U. S. 587, the court says:

"The doctrine is well settled, that the option to avoid such a sale must be exercised within a reasonable time. This has never been held to be any determined number of days or years, as applied to every case, like the statute of limitations, but it must be decided in each case upon all the elements of it which affect that question. These are generally the presence, or absence of the parties at the place of the transaction, their knowledge or ignorance of the sale, and of the facts which render it voidable, the permanent or fluctuating character of the subject-matter of the transaction as affecting its value and the actual rise or fall of the property in value during the period within which this option might have been exercised. In fixing this period in any particular case, we are but little aided by the analogies of the statutes of limitation; while, though not falling exactly within the rule as to time for rescinding or offering to rescind a contract by one of the parties to it for actual fraud, the analogies are so strong as to give to this latter great force, in the consideration of the case. In this class of cases the party is bound to act with reasonable diligence, as soon as the fraud is discovered, or his right to rescind is gone. No delay for the purpose of enabling the defrauded party to speculate upon the chances which the future might give him of deciding profitably to himself whether he will abide by his bargain or rescind it, is allowed in a court of equity. . . . The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for a thousand dollars, as its fair value, may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious of permitting one holding the right to

Patterson v. Hewitt.

assert an ownership in such property or voluntarily await events, and then decide, when the danger which is over has been at the risk of another to come in and share the profit."

In the case of Haywood v. National Bank, 96 U. S. 611, the court says:

"But the appellant is equally concluded by the lapse of time during which the transaction has been allowed to stand, without any effort upon his part to impeach it. It must now be regarded as unimpeachable. Courts of equity often treat lapse of time, less than that prescribed by the statute of limitations, as a presumptive bar, on the ground 'of discouraging stale claims, or gross laches, or unexplained acquiescence in the assertion of an adverse right.' 2 Story, Eq. Jr. 1520."

In Smith v. Clay, (A. M. B.) 645, Lord Camden said:

"A court of equity which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, when the party has slept upon his right and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. When these are wanting, the court is passive and does nothing. Laches and neglect are always discountenanced."

In Harwood v. Railroad Company, 17 Wallace 79, the court said:

"That without reference to any statute of limitations, equity has adopted the principle that the delay which will defeat a recovery, must depend upon the particular circumstances of each case. The question of acquiescence or delay may often be controlled by the nature of the property which is the subject of litigation. 'A delay which might have been of no consequence in an ordinary case, may be amply sufficient to bar relief when the property is of a speculative character, or is subject to contingencies, or where rights and liabilities of others have been in the meantime varied.

If the property is of a speculative or precarious nature, it is the duty of a man complaining of fraud to put forward his complaint at the earliest possible time. He can not be allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to his advantage." Haywood v. Eliot National Bank, 6 Otto 611.

In the case of Sullivan v. Portland, etc., Railroad Company, 94 U. S. 806, the Supreme Court of the United States quotes approvingly the exact language of the court in the case of Smith v. Clay, supra, and in addition the court said:

"To let in the defense that the claim is stale, and that the bill can not, therefore, be supported, it is not necessary that a foundation shall be laid by any averment in the answer of the defendants, if the case, as it appears at the hearing is liable to the objection by reason of the laches of the complainants, the court will, upon that ground, be passive and refuse relief. Every case is governed chiefly by its own circumstances; sometimes the analogy of the statute of limitations is applied; sometimes a longer period than that prescribed by the statute is required; and in some cases a shorter time is sufficient; and sometimes the rule is applied where there is no statutable bar. It is competent for the court to apply the inherent principle of its own system of jurisprudence and to decide accordingly."

In Galliher v. Cadwell, 145 U. S. 368, the court said:

"The laches of the appellant is such as to defeat any rights which she might have had, even if these prior questions were determined in her favor; and in this respect it is worthy of notice that there has been in a few years a rapid and vast change in the value of the property in question. Of course such a rapid increase during this decade implies an equal and enormous increase of the property so situated as to be an addition to the city, and the question of laches turns not simply upon a number of years which have elapsed between the accruing of

her rights, whatever they were, and her assertion of them, but also upon the nature and evidence of these rights, the changes in value and other circumstances occurring during that lapse of years. The cases are many in which this defense has been invoked and considered. It is true that by reason of their differences of fact, no one case becomes an exact precedent for another; yet a uniform principle pervades them all. They proceed on the assumption that the party to whom laches is imputed has knowledge of his rights and an ample opportunity to establish them in a proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that because of the change in condition or relations during this period of delay, it would be an injustice to the latter to permit him to now assert them."

The court then after referring to numerous cases supporting the doctrine just announced says:

"But it is unnecessary to multiply cases. They all proceed upon the theory that laches is not like limitation a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced —— and in equity founded upon some change in the condition or relations of the property or the parties."

In the case of Penn. Mutual Life Insurance Company v. Austin, 168 U. S. 685, the court reviews a very large number of cases supporting the doctrine announced in the cases above cited, and in addition to those above cited, the court summing up the doctrine laid down by the authorities reviewed, says:

"The reason upon which the rule is based is not alone the lapse of time during which the neglect to enforce the right has existed, but the changes of condition which may have arisen during the period in which there has been neglect. In other words, where the court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, or that intervening rights of third

Patterson v. Hewitt.

persons may be destroyed or seriously impaired, it will not exert its equitable powers in order to save one from the consequences of his own neglect."

In the case of Townsend v. Vanderworker, 160 U. S. 171, the court says:

"The question of laches does not depend as does the. statute of limitation, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether under all the circumstances of the particular case, plaintiff is chargeable with a want of due diligence in failing to institute the proceeding before he did." Speidel v. Henrici, 120 U. S. 377, 387; Galliher v. Cadwell, 145 U. S. 368, 371; Hammond v. Hopkins, 143 U. S. 224, 250; Willard v. Woods, 164 U. S. 502, 524; Sullivan v. Portland & Kennebec Railroad, 94 U. S. 806, 811; Lansdale v. Smith, 106 U. S. 391, 394; Badger v. Badger, 2 Wallace 87, 95; Line & Bodley Company v. Locke, 159 U. S. 193; Mackall v. Cassilear, 137 U. S. 556; Whitney v. Fox, 166 U. S. 637, 647, 648; Gildersleeve v. New Mexico Mining Company, 161 U. S. 573, 582; Abraham v. Galveston City Company, 146 U. S. 102, 116; Foster v. Mansfield, Cold Water, etc., Railroad 146 U. S. 88, 102; Hoyt v. Lathan, 143 U. S. 553; Hauner v. Moulton, 138 U. S. 486, 495; Richards v. Mackall, 124 U. S. 183, 189; Roberts v. Northern Pacific Railroad, 158 U. S. 1, 11.

The authorities above cited, it will be observed, are all causes determined by the Supreme Court of the United States. We will now refer to some of the decisions of the State courts in relation to the same doctrine. At the outset it may be admitted that the courts of the different States are not harmonious upon this question. In some of the States this doctrine is sustained and applied to the full extent laid down by the Supreme Court of the United States. In other States the courts while applying the doctrine above referred to, hold that the period of laches is governed by the statute of limitations specifically applicable to equity actions and de-

fenses.    The following and numerous other cases to
which reference might be made, sustain the doctrine
laid down by the Supreme Court of the United States,
and the weight of authority supports the doctrine laid
down by the courts of the United States.    Calhoun v.
Delhi & Middleton Railroad Company, 24 N. E. Rep.
27; Mason v. Sanford, 137 N. Y. 497; Boyer v. East, 161
N. Y. Court of Appeals 580; Pollard v. Clayton, 13 Mor-
rison's Min. Reps. 334; Hagerman v. Bates, 38 Pacific
1100; Great West. Min. Co. v. Woodmas of Alston Min.
Co., 23 Pac. 908; Farns v. Vivian, 33 Law J. Ch. 517;
Kinney v. Webb, 49 Fed. 512; Graff et al. v. Portland &
Co., 54 Pac. 854; Dobbins v. Wilson, 107 Ill. 17; Whipple
v. Whipple, 109 Ill. 418; Hoyt v. Pawtucket Institute,
110 Ill. 390; Stiger v. Bent, 111 Ill. 328; Greenlees v.
Greenlees, 62 Ala. 330; James v. James, 55 Ala. 525; Ab-
ernathy v. Moses, 73 Ala. 381; Brown v. Covilland, 6
Cal. 566; Harris v. Hillegras, 66 Cal. 79; Chapman v.
Bank of California, 97 Cal. 155; Missouri Land & Water
Co. v. Flash, 97 Cal. 610; 73 Cal. 289; Sheldon v. Mock-
well, 9 Wis. 166; Scruggs v. Decatur, etc., 5 South. Rep.
44; Moore v. McIntyre, 110 Mich. 237; Davis v. Fox, 59
Mo. 127; Landrum v. Union Bank, 63 Mo. 56; Bliss v.
Pritchard, 67 Mo. 181.

We have quoted from numerous cases decided by
the Supreme Court of the United States, and various
States, and have quoted rather liberally from some of
them in order that it may be seen that the circumstances
of each particular case must determine whether or not it
is proper to apply the doctrine of laches, and it will be
observed that in every case the circumstances were dif-
ferent and presented in various forms the inequity
of granting relief, and therefore, upon that ground the
doctrine of laches was sustained as a defense, thus with-
holding from the complainant the relief prayed for by
him when he was properly chargeable with the resultant
delay.    In many of the cases cited, the change in the
value of the property involved either by enchancement or

Patterson v. Hewitt.

depreciation, has been considered of the utmost importance in sustaining or overruling this defense. In the case now under consideration, the fact is that the condition of the property in controversy had changed very greatly between the time the alleged rights of the appellants attached and the commencement of this suit. At the time the appellants alleged that their rights attached the property involved was of litle fixed and certain value; its value was largely speculative and was evidently so regarded, as the evidence shows that the interest claimed by the appellants in the property was offered for sale for a very small consideration before the appellants left the Territory, and that other interests in the same property were also disposed of from time to time prior to the year 1890 for small consideration. In the year 1890, however large bodies of valuable minerals were discovered through the efforts of the appellees Hewitt, Watson, Fergusson and others, as a result of the expenditure of a large amount of money and the performance of a large amount of labor in the development of the property, and as a result of such discovery the property rapidly enhanced in value and several hundred thousand dollars of valuable minerals were taken therefrom prior to the commencement of this action, and the enhancement in value of this property was due alone to the diligent efforts of the appellees and those co-operating with them in the development of the property, and without any assistance or the contribution of either money or labor by either of the appellants, or any one for them, for the purpose of developing the property. The condition of the property, therefore, was very greatly changed prior to any attempt of the appellants to invoke the remedy prayed for in this case. Indeed, appellant's counsel in their admirable brief admit the marked change in the condition of the property in this case. At page 33 of appellant's brief we find the following statement:

"It would be idle to deny that the record discloses a

change in the condition of the property. The testimony shows that for years the property was of great probable, but no certain, value, and that after 1890 it became of great certain value, and that this change was brought about by the perseverance of defendants (appellees in this case) in developing the property."

Thus, the fact that the property became from one of uncertain value, to one of great certain value prior to the attempt of the appellants to enforce any rights, claimed by them, is an admitted fact, and this fact affords a very strong reason, taken in connection with the long period of delay in this case, why it would be inequitable to permit appellants to obtain the relief prayed for. To permit them to recover in this case, would be to allow them to profit from the diligent efforts of others without any efforts or good faith shown upon their part. The character of the property involved has much to do with the application of this defense, also, as is pointed out in numerous cases above referred to. In this case the property involved was mining property, which is known to be of uncertain and fluctuating value. The difference of a few days, weeks, months or years may work a vast change in the value of mining property, and hence, as to this character of property greater diligence and more prompt action is necessary to the preservation of the rights of those claiming interests therein, which are of a possessory nature, and which can be preserved alone by diligence in complying with the provisions of the mining laws of the United States.

In the case of Twin-Like Oil Company v. Marbury, above referred to, the Supreme Court of the United States refers to Bliss v. Edmunson, 8 De G. M. & G. 787 and Pendergast v. Turton, 1 You. & Coll.

"The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for a thousand dollars as its fair

value may, by the natural changes of a week, or the energy and courage of desperate enterprise in the same time be made to yield that much every day.    The injustice, therefore, is obvious of permitting one holding the right to assert an ownership in such property to voluntarily await the event and then decide when the danger which is over, has been at the risk of another, to come in and share the profit.    While a much longer time might be allowed to assert this. right in regard to real estate whose value is fixed, on which no outlay is made for improvement, and be little changed in value, the class of property here considered subject to the most rapid, frequent and violent fluctuations in value of anything known as property, requires prompt action in all who hold an option, whether they will share its risks or stand clear of them."

In Haywood v. National Bank, supra, we find the following reference to this:

"If the property is of a speculative or precarious nature, it is the duty of a man complaining of fraud to put forward his complaint at the earliest possible time.    He cannot be allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or repudiate it if that should prove to his advantage."

The appellants in this case had full knowledge of any rights which they had in the property in controversy in April, 1885, whether their rights were acquired by doing the work required of them or by demand for conveyance by Hewitt.    Both of these events transpired as early as that date.    If their rights had accrued to them in April, 1885, no effort was made by them to enforce their rights prior to the commencement of this suit in 1893.    Therefore, at least eight years elapsed before the appellants took any steps whatever to enforce rights claimed by them in this property, after the appellants had full knowledge of the rights they now seek to enforce in this action.    When it is considered that the property involved is mining property, subject to violent fluctua-

tions in value, and the fact that in this case the value of the property was largely enhanced by the efforts of the appellees, can it be said that the appellants exercised due diligence, or reasonable diligence in the enforcement of the rights claimed by them in this property? We think not. And as laches means a want of proper and reasonable diligence, the appellants in this case are chargeable with laches, and they cannot escape the consequences for which they alone are responsible. Johnson v. Standard Mining Company, 148 U. S. 360. Nor do the appellants in this case by their bill, nor does the testimony in the case, show any reasonable cause, or in any satisfactory manner account for the long delay in bringing this suit. No excuse whatever is offered on behalf of C. Ewing Patterson. Henry J. Patterson by way of excuse as we find testified that when he first demanded a deed in 1884, Hewitt put him off, and promised to make a deed later. This will not suffice as an excuse on the part of Patterson, because the court found that Henry J. Patterson again demanded a deed in April, 1885, and Hewitt refused to execute the same, so that if demand and refusal of deed was necessary to fix his rights they were absolutely fixed in April, 1885.

In the case of Hume v. Beal, 17 Wallace 350, the court said:

"She says in general terms that she called on Beal repeatedly to settle, and that he promised to do so, and that these promises induced her not to sue him. This is the extent of her testimony on this subject, and her statement is so general, and so obviously necessary to avoid the bar of the statute of limitations and lapse of time, which were pleaded, that it carries little weight with it."

Henry J. Patterson testifies by way of excuse, that he was poor and had not the means to contribute further to the expense incurred in the development of the property. But poverty will not excuse a failure to use prop-

er diligence in the assertion of legal rights where the party has, or ought to have full knowledge of his alleged rights, as in this case.

Again, a change in the relation of the parties and the death or absence of witnesses are considered by the courts of equity in applying laches to stale claims. It is true that in this case death did not intervene to prevent the production of material testimony, but it is a fact that the witness, Burgess, who remained in the vicinity of the property and who knew the appellees were developing the property, and who acted as the agent of one or both of the appellants, and whom the testimony shows to have been in correspondence with one or both of the appellants, left the Territory in 1891, and his whereabouts being unknown his testimony could not be obtained in this case, and yet it is apparent that his testimony would have been of great materiality and value. If his place of residence was known to the appellants, it was not divulged, and, therefore, his testimony was not available even by deposition, and the power of attorney, which constituted his authority to act, as testified by Henry J. Patterson, was also absent and could not be produced in evidence. The long delay in the commencement of this suit undoubtedly produced this result, for had the suit been commenced at any time up to and including the year 1890, the testimony of Burgess could have been produced, as he was within the jurisdiction of the court. Neither can it be said that there was no change in the relation of the parties to the property prior to the commencement of this suit, because the Old Abe corporation was organized in 1892, and the whole, or almost the entire property, was conveyed to it by Hewitt, the locator of the property, and those to whom he had conveyed, and the company had issued stock in lieu of the individual interests in the property. It is true that the Old Abe Mining Company was organized by Hewitt, Fergusson, Watson and others, and the stock was divided between

them, and doubtless remained so up to the time of the trial, but at least the appellee Mathew Hoyle came into the possession of his rights by a conveyance from Watson, dated June 9, 1890, and Hoyle conveyed five forty-eighths (5-48) of the property to the Old Abe Company, retaining one forty-eighth (1-48). He, therefore, acquired whatever interest he had in 1890 prior to the enhancement of the value of the property and conveyed to the company a portion of his holdings after the property had largely increased in value. So that while the change of the relation of the parties to the title was not radical, there was a change which, owing to the enhancement of the value of the property, became an important one, when the prayer of the bill, as to the relief sought, is considered. The prayer of the bill being substantially, that Hewitt and the Old Abe Company be required by the court to convey to appellants free and clear of all encumbrances or liens an undivided one-fourth part of said two claims, the court making such provision in its decree as may be necessary to and proper for the protection of said stockholders in said company given said Hewitt, and all the property held by said Hewitt, both real and personal, be declared by the court to be subject to a lien on behalf of appellants for the payment of their full one-fourth of the value of all such ore, or ores, taken from said claims; that defendants, appellees, Fergusson, Watson, Hoyle and the Old Abe Company be required to render an account for what has been received by each of them from the proceeds of such ores, in case Hewitt shall not be possessed of sufficient property to fully pay what may be found due appellants, and the other defendants shall be required to pay the deficiency, and appellants be declared to have a lien upon the whole of said two claims for the payment of such deficiency. And there is also a prayer for a restraining order and the appointment of a receiver.

The failure of the appellants to take any steps whatever for the enforcement of their alleged rights for at

least eight years, after they had full knowledge of such rights, and also knowledge that their rights had been repudiated and refused by Hewitt whom they claimed to be trustee of their rights, and the silence of both themselves and their agent, and their failure to in any way contribute to the development of the property and the enhancement of its value, was sufficient to raise a presumption of the abandonment of any rights claimed by them in the property, and their silence and acquiescence in the refusal of the trustees to convey, and the testimony in this case fully supports the finding of the court on that point, confirms the belief that when the appellants removed from the Territory they intended to pay no further attention to this property, and never intended to contribute to its development, or the performance of assessment work required by the Government to sustain the possessory title which alone existed at that time, nor contributed to the expense of obtaining a patent, and, therefore, as found by the court, they apparently took no interest whatever in the property during their absence, and the conclusion is necessarily reached that the knowledge of the great enhancement of value of this property which occurred in the year 1890, and thereafter was the circumstance which caused them to attempt to assert the rights formerly claimed by them in this property. Such being the case, they fall within the doctrine laid down in Oil Company v. Marbury, supra, that: "No delay for the purpose of enabling the defrauded party to speculate upon the chances which the future may give him of deciding profitably to himself whether he will abide his bargain, or rescind it, is allowed by a court of equity." Or, as was said in the case of Kinney v. Webb, 49 Federal Reporter 512:

"The rule has a pointed and salutary application to controversies like this. Regarding mineral lands, such property is exposed to the utmost fluctuations in value. Its wealth lies beneath the surface. It is hidden from the view. Money, energy, labor and skill are required to

develop it.   To-day the indications are full of promise.
To-morrow, they are as full of discouragement.   The
mine which to-day may be deserted and out of consider-
ation, or. which, being worked, produces small results,
may in a few years, by persistent energy and the expend-
iture of money, turn out to be vastly productive and val-
uable.   The courts all say, respecting suits to vacate
contracts affecting such property, and attempts to re-
claim it, the party will be held to the highest diligence
and acceleration in his movements.   He cannot stand by
and speculate on the chances. .  He cannot delay and
say by his acts, it is mine if it be a good thing.   You may
keep it if it is a poor thing.   So when parties have
waited four or five years, and even a shorter period, after
knowledge of the fraud, during which time the property
has been improved and its value greatly augmented, the
delay constitutes a fatal estoppel."

These considerations in the opinion of this. court
fully demonstrate that it would be highly inequitable
to grant the relief prayed for by the appellants in this
case, the circumstances being such as to justify, in fact,
demand the application of the law of laches as applied
to stale and inequitable claims.   The decree of the court
below dismissing the bill was a proper decree, and
should not be set aside, unless the ten years statute of
limitations is   applicable   here, and   lapse of time
alone, governs the application of laches by courts of
equity in this Territory.

Proceeding then to the consideration of the matter
of the limitations, it will be observed that in the cases
above cited, and in the case of Galliher v. Cadwell, 145
U. S. 368, it has been repeatedly said as to the applica-
tion of laches in courts of equity:

"They all proceed upon the theory that laches is not
like limitation, a mere matter of time; but principally a
question of the inequity of permitting a claim to be en-
forced—an inequity founded upon some change in the
condition or relations of the property or the parties."

It will, therefore, be seen that unless the legislation of this Territory necessitates a different application of the doctrine of laches the doctrine above laid down must control, and, therefore, time while one of the elements to be considered in the application of equitable laches, many other considerations are of equally, if not of more value in determining whether or not this defense should be sustained. In the case last above referred to, the Supreme Court refers to a number of cases in which the doctrine of laches applied regardless of the statute of limitations, and where the period of time which elapsed was comparatively short. The courts points out that in the carse of Harwood v. Railroad Company, supra, and Davison v. Davis, 125 U. S. 90, a delay of five years was held to be inexcusable laches. In Oil Company v. Marbury, supra, and Haward v. National Bank, supra, four years was held to be laches. In Brown v. County of Buena Vista, supra, seven years was held to be laches, although the information of the complainants was received but twenty months before the commencement of the suit. In Holgate v. Eaton, 160 U. S. 33, and in Societe Fonciere v. Milliken, supra, a delay of two years in each case was held to be inexcusable laches. In the case of Pollard v. Clayton, 13 Morrison's M. Reports 334, a suit relating to mining property, eleven months was held to be fatal delay, and in the case of Hagerman v. Bates, 38 Pacific Reporter 1100, two years was held to be a bar to recovery and further that the defense of laches is in no sense dependent upon the statute of limitations. In the case of the Great West. Mining Company v. Woodmas, of Alston Mining Company, 23 Pacific Reporter 908, the court said:

"In the case of Atwood v. Small, 6 Clark & F. 356, the Lord Chancellor was of the opinion that relief should be refused in reference to mining property, for the reason that a delay of six months had intervened be-

tween the time at which the complainants acquired knowledge of the alleged frauds, and the bringing of the motion."

And in the case of Earnest v. Vivian, 33 Law J. ch. 517, it is said:

"The statute fixes a limitation beyond which the courts cannot extend the time but within this limit, the peculiar doctrine of courts of equity should prevail."

In the case of Kinney v. Webb, supra, four or five years was declared laches after knowledge that the property was being improved and augmented in value.

"In a recent case of Graff et al. v. Portland & Company, 54 Pacific Reporter 854, laches was applied because of the delay of less than two years, and the statute of limitations was expressly held to be inapplicable."

In the case of Alsop v. Riker, 15 U. S. Supreme Court Reporter 162, the court says:

"The case is one peculiarly for the application of the rule that equity in the exercise of its inherent power to do justice between the parties, will, when justice demands it, refuse relief, even if the time elapsed without suit is less than that prescribed by the statute of limitations."

That portion of section 2938 of the Compiled Laws of 1897 which the appellants rely upon is substantially as follows:

"No person shall maintain any suit in law or equity for any lands but within ten years next after his right to maintain such suit shall have accrued, and all suits in law or equity for the recovery of any lands shall be sued within ten years next after the title or cause of action accrued, and at no other time after ten years shall have expired."

We are unable to see anything in this section of the statute, beyond a simple provision that after ten years have elapsed from the time the title or cause of action accrued, no suit can be brought for the recovery of lands in a court of law or equity. This is simply a ten years

statute of limitations for the recovery of lands alone
and made applicable to courts of equity as well as the
law in this Territory, but it does not extend to all act-
ions for the enforcement of equitable rights, and there-
fore, it is limited in its effect.   Even if this statute was
applicable in this case, it does not prevent the applica-
tion of the equitable doctrine of laches within the ten
years where the relief sought is shown to be wholly in-
equitable.   The statute is not intended to have any ap-
plication to actions commenced within ten years from
the time the right of action accrued, but simply pro-
vides that after ten years have elapsed, there shall be no
remedy for the recovery of lands, either in a court of law
or equity.   In the State of New York there is a statute
of limitations made specifically applicable to actions in
equity, and it is even more comprehensive than our stat-
ute, and yet, the courts of New York since the passage
of that statute, have in several cases applied the doctrine
of laches as laid down by courts of equity where the time
elapsed was less than the period of ten years provided
for in the statute of that State.   In the case of Calhoun
v. Delhi & Middleton Railroad Company, the supreme
court of the State of New York said:

"In the present case the cause of action for the can-
cellation of the bonds was not barred by the ten year
statute applicable to equitable actions.   But a period of
nine years had elapsed after the bonds were issued be-
fore the commencement of the action.   But we appre-
hend that the period of limitation of equitable actions
fixed by the statute is not, where a purely equitable rem-
edy is invoked, equivalent to a legislative direction, that
no period short of that time shall be a bar to the relief
in any case, or precludes the court from denying relief
in accordance with equitable principles for unreason-
able delay, although the full period of ten years has not
elapsed since the cause of action accrued."

In Mason v. Sandford, 137 N. Y. 497, the court de-
cided that in an action at law, no mere lapse of time

will absolutely defeat an application for a revival of the action, and a continuance thereof in the name of the representative of a deceased party, but the motion to revive, however, may be denied, for laches in making it. In an equitable action there is a time limitation of ten years, but the court may deny the motion, on account of prejudicial laches within that period.

' In the case of Boyer v. East, 161 N. Y. Court of Appeals 580, a recent case, decided in February, 1900, the court applies the same doctrine as the case above cited. In this case real estate was sold, the heirs being 15 and 17 years old, at the time the sale took place. After coming of age, and their right of action had fully accrued, they failed for a period of eight years to bring an action to set aside the sale. The court refused to entertain the action, and in deciding the case said:

"The defendants had the right to invoke the equitable doctrine that as the plaintiffs had slept so long on their rights, they should be deemed to have waived the right to attack the title, acquired through their mother's purchase and conveyance. Whether a court of equity should come to the aid of those who have failed in diligence will depend upon the circumstances of the case. These plaintiffs were beyond the age, when, at common law, guardianship in socage might cease. One was in his 15th year, and the other in his 17th year at the time of the sale. They were, more or less, conversant with what their mother had done; but upon attaining their majorities in 1886 and 1888, though she survived until 1890, there was no assertion of any claim by them until in 1896. If they had the election to treat as void the sale to and the conveyance by their mother, it was incumbent upon them to be reasonably diligent, and the delay in bringing such an action was, in my opinion, under the circumstances, fatal."

All of the judges of the court concurred in this opinion, except Chief Justice Parker, who concurred in that portion of it which we have just quoted. Old Col-

ony Trust Company v. Dubuque Traction Company, 89 Federal Reporter 794; Hubbard v. Mandant Trust Company, 87 Federal Reporter 51.

In the case of Continental National Bank v. Heilman, 86 Federal Reporter 514, in construing the statute of ilmitations of Indiana, Judge Wood says:

"The provisions of the Indiana statute that the suit of a creditor out of the State must be brought within two years after the final settlement of the estate, would, therefore, like any other statute of limitation which allows reasonable time from the bringing of suit, be recognized by all courts as valid; but like all other such statutes it will not be deemed to give a right to one within the time limited regardless of laches, or other considerations which would make the suit when brought inequitable."

Graff et al. v. Portland, etc. & Company, supra; Alsop v. Ricker, supra.

It is scarcely necessary to pursue this branch of the case further, as the cases last referred to, are directly in point, and in each case a statute of limitations existed fully as broad and even more comprehensive, than the statute relied upon by the appellants here, and yet, the courts applied the doctrine of equitable laches, independent of the statute of limitations, notwithstanding the statutes were made specifically applicable to equitable actions.   Many cases may be found in which courts of equity will be governed by the statutes of limitations, and entertain an action, and give relief for the full period provided by the statute.   Indeed this would doubtless be done in all cases where the facts of the case, do not show, that the relief sought was inequitable. A case might be entertained, even after the limitation had expired, but in many cases, the courts of the States, as well as those of the United States have laid down, and asserted the right to do equity wherever the circumstances demanded it, and that the right to exercise the

inherent power of courts of equity, could not be taken away by a limitation statute, where time alone controls. The facts in this case to which we have above referred, it seems to us, show, that the relief sought in this case is inequitable, and, therefore, one of those cases in which the relief sought should be denied.

We, therefore, hold that the law of laches as applied by courts of equity to stale claims, was properly applied in this case, and that the statute of limitations is no bar to its application.

The appellants seek to reverse the judgment in this case upon the further ground, that under the facts they were entitled to recover because of a resulting trust, and that the remedy sought was the enforcement of a resulting trust. The court below found that Hewitt acted in the capacity of a trustee, but did not state what kind of a trust relation existed. There are several kinds of trusts, and it is important in this case to determine what kind of a trust existed between Hewitt and the appellants, and this question must be determined alone by the facts. The mining locations covering the ground in controversy here, were made by John Y. Hewitt individually, and in his own name. The appellants in this case claim the interest for which they now seek to recover, under an agreement made between themselves, Hewitt and others at a meeting held in August or September, 1883. This agreement was a parol or unwritten contract or agreement. There is no pretense of a written contract or agreement in this case. Whatever rights, therefore, the appellants had in this property, and if John Y. Hewitt, became their trustee at all, it was by virtue of this parol contract or agreement between the parties. If they relied upon this agreement, as the testimony shows they did, it was an express trust, and not a resulting trust. If, therefore, an express trust existed between the parties in 1883, the trust originated in a parol or unwritten contract or agreement. There was no express provision that the agreement should be per-

formed within a year.  If, then, the contract or agreement involved in real estate, as contended by the appellees, it would be void under the statute of frauds which is in force in New Mexico.  If, however, the appellants seek to avoid the force of the statute of frauds, on the ground, that the parol contract entered into was performed within a year, and was, therefore, an executed contract, section 2916 and 2930 of the Compiled Laws of 1897 would seem to be applicable to this case.  Section 2916 is one of the sections of the statute of limitations of this Territory and reads as follows:

"Those founded upon accounts and unwritten contracts; those brought for injuries to property or for the conversion of personal property or for relief upon the ground of fraud, and all other actions not herein otherwise provided for and specified, within four years."

This section established a limitation of four years in all actions founded upon the provisions of the section. One of the provisions of this section is:  "All actions founded upon unwritten contracts."  There does not seem to be any qualification to this provision, but its terms seem to be broad enough to include all unwritten contracts.  It cannot well be said that this section is alone applicable to actions at law, so as to exclude agreements establishing trust relations cognizable in courts of equity, and it would seem that the section was intended to be broad enough to include equitable actions for the reason, that another provision applies the same limitations to actions for relief upon the ground of fraud which is a recognized basis for the exercise of equitable jurisdiction.

Now admitting that the agreement or contract was for the establishment of trust relations between the parties, it would come within the provisions of section 2930, Compiled Laws, 1897, which reads as follows:

"None of the provisions of this act shall run against causes of actions originating in or arising out of trusts when the defendant has fraudulently concealed his

cause of action, or the existence thereof from the party entitled or having the right thereto."

This section does not apply of course, to all trusts, but it is applicable directly, to trusts, other than those where the defendant has "fraudulently concealed the cause of action or the existence thereof, from the party entitled or having the right thereto." There is no attempt in this case to show that there was any fraudulent concealment of the cause of action or the existence thereof from the appellants. On the contrary, it is abundantly shown, and the court so found, that the appellants not only claimed an interest in this property and demanded a conveyance of the same to them by Hewitt, as early as 1885, Henry J. Patterson testifying that he demanded a conveyance as early as 1884, but appellants were also aware that Hewitt openly refused to comply with that demand and perform any trust agreement which appellants claimed, as early as that date.

The first part of this section, therefore, seems to apply, because the cause of action in this case originated in or arose out of a trust, in the very language of the section, and would be subject to the statute of limitations of four years, provided for in section 2916. It has been repeatedly held, that where an action is brought to enforce a trust, if the trust has been repudiated by the trustee, and the *cestui que trust* have knowledge of that fact, he or they will be held to prompt diligence in asserting rights which they might have at the time of the repudiation by the trustee. In this case the court finds that the appellants had knowledge of the repudiation by the trustee and the refusal to convey by Hewitt as early as April, 1885, and as they claimed to have performed their part of the agreement prior to that time, and made demand for deed, their cause of action was fully accrued at that time; it accrued either upon the performance by them of their part of the contract, or by demand for deed. Therefore, the statute of limitations would begin to run from that date, and after four

years had elapsed, from that date, the appellants would be without a remedy, and the relief sought in this case would be barred.

In the case of Godden v. Kimmel, 99 U. S. 201, the court said:

"Courts of equity acting on their own inherent doctrine of discouraging for the peace of society antiquated demands refuse to interfere in attempts to establish a stale trust, except where the trust is clearly established, or where the facts have been fraudulently and successfully concealed by the trustee from the knowledge of the *cestui que trust*. Relief in such case may be sought but the rule is that the *cestui que trust* should set forth in the bill specifically what were the impediments to an early prosecution of the claim, and how he or she came to be so long ignorant of their alleged rights, and the means used by the respondent to keep him or her in ignorance, and how he or she first came to the knowledge of their rights."

And in Marsh v. Whitmore, 21 Wallace 185, the court said:

"The party appealing to the conscience of a chancellor in support of the claim where there has been laches in prosecuting it, or long acquiescence in the assertion of an adverse right, 'should set forth in his bill specifically what were the impediments to an early prosecution of his claim;' and if he does not, the chancellor 'may refuse to consider his case on his own showing, without inquiring whether there is a demurrer or any formal plea of the statute of limitations contained in the answer.'"

And so it is held in numerous other cases, that where the trustee has repudiated the trust claimed, the party seeking to enforce rights under it must act with diligence, and if delay has occurred, it must be shown what were the causes for the delay or the impediments to an early assertion of the rights of the *cestui que trust*. In this case, appellants have failed in both respects.

There has been both unreasonable delay and absolutely no reason shown why the appellants did not attempt to enforce the rights claimed by them within a reasonable time after they had fully accrued in 1885, and they alone must suffer the consequences of their own voluntary negligence.   Wagner v. Baird, 7 Howard 234; Lansdale v. Smith, 106 U. S. 391; Naddo v. Sanders, 93 U. S. 55; Badger v. Badger, supra; Mining Company v. Watrous, 61 Federal Reporter 217.

As to the application of the statute of limitations and also the doctrine of laches in the case of trusts where the *cestui que trust* has knowledge of the repudiation of the trust, the Supreme Court of the United States in the case of Speidel v. Henrici, 120 U. S. 377; said.

"As a general rule, doubtless, length of time is no bar to a trust clearly established, and express trusts are not within the statute of limitations because the possession of the trustee is presumed to be the possession of the *cestui que trust.*"   Prevots v. Gratz, 6 Wheaton 481; Lewis v. Hawkins, 23 Wallace 119; Railroad Company v. Durant, 96 U. S. 576.

But this rule is, in accordance with the reason on which it is founded, and as has been clearly pointed out by Chancellor Kent and Mr. Justice Story, subject, to this qualification, that time begins to run against a trust as soon as it is openly disavowed by the trustee, insisting upon an adverse right and interest, which is clearly and unequivocally made known to the *cestui que trust;* as when, for instance, such transactions take place between the trustee and the *cestui que trust,* as where in case of tenants in common amount to an ouster of one of them by the other (citations) ; this qualification has been often recognized in the opinions of this court, and distinctly affirmed by its latest judgment upon the subject. Wilison v. Watkins, 3 Peters 43; Boone v. Chiles, 10 Peters 177; Seymore v. Freer, 8 Wallace 202; Bacon v. Rives, 106 U. S. 99; Philippi v. Philippe, 115 U. S. 151.

We are of the opinion, therefore, that the trust relation claimed in this case by the appellants and the rights which they allege under it, are not available as against the defense of laches. This suit was brought and final decree rendered prior to the adoption of the code in this Territory, and consequently the provisions of the code are not applicable here. The cause is of purely equitable jurisdiction. The suit was commenced by bill in equity, and the entire proceedings were conducted according to the law applicable to courts of equity, and as such, it should be determined upon purely equitable principles. Being of the opinion that the decree of the court below was a proper one under the facts and the law of this case, it will be affirmed with costs; and it is so ordered.

Mills, C. J., Parker and Crumpacker, JJ., concur.